IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

SANTOS ARGUETA, BLANCA
GRANADO, DORA ARGUETA,
TOMAS ARGUETA, AND
JELLDY ARGUETA, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF LUIS
FERNANDO ARGUETA,
                       PLAINTIFFS,

                                    CIVIL ACTION NO.

V.

                                 _____

CITY OF GALVESTON AND OFFICER
DERRICK S. JARADI,
                       DEFENDANTS.

<u>PLAINTIFFS', SANTOS ARGUETA, BLANCA GRANADO, DORA
ARGUETA, TOMAS ARGUETA, AND JELLDY ARGUETA, INDIVIDUALLY
AND ON BEHALF OF THE ESTATE OF LUIS FERNANDO ARGUETA'S
ORIGINAL COMPLAINT</u>

      This wrongful death lawsuit is brought by Plaintiffs, Santos Argueta; Blanca

Granado; Dora Argueta; Tomas Argueta; and Jelldy Argueta, who is suing

individually and on behalf of the estate of Luis Fernando Argueta (hereinafter and

sometimes referred to as "decedent;" "Luis Argueta;" and/or "Luis"). The lawsuit

is brought against the City of Galveston, Texas, and Officer Derrick S. Jaradi, a

Galveston Police Officer.  Plaintiffs contend the decedent, Luis Argueta's, civil rights were violated, leading to his death on June 25, 2018.  Plaintiffs would show unto the Court as follows:

I.     – <u>JURISDICTION AND VENUE</u>

1.    Jurisdiction is invoked under 28 U.S.C. section 1331 (federal question) and under 42 U.S.C. section 1983.

2.    Plaintiffs assert violation of decedent's constitutional rights under the Fourth Amendment of the United States Constitution (excessive force and seizure as that term is understood.

3.    The underlying events occurred in the City of Galveston, Texas, which lies within the confines of the Southern District of Texas.

II.     – <u>PARTIES</u>

4.    Santos Argueta is the decedent's father, and is a resident of Galveston County, Texas.

5.    Blanca Granado is decedent's mother, and is a resident of Galveston County, Texas.

6.    Dora Argueta is decedent's sister, and is a resident of Harris County, Texas.

7.    Tomas Argueta is Luis Argueta's brother, and is a resident of Galveston County, Texas.

8.  Jelldy Argueta is decedent's sister; is a resident of Galveston County, Texas; and brings suit individually and on behalf of the Estate of Luis Fernando Argueta.

9.  The City of Galveston, Texas is a municipal corporation in the State of Texas.

10.  Defendant Officer Derrick S. Jaradi, at all times material to this action, has been a peace officer employed by the City of Galveston, and remains so employed.

### III.   – UNDERLYING FACTS SUPPORTING CLAIMS

11.  On June 24, 2018, Luis Argueta borrowed a car from a friend (Melissa Michelle Naranjo) in order to take his girlfriend (Maryann Luna) out for the evening.

12.  Luis Argueta had borrowed Ms. Naranjo's car on previous occasions.

13.  Maryann Luna was nineteen (19) years of age at the time of the events which are the subject of this lawsuit.

14.  Luis Argueta was nineteen (19) years of age at the time of the events which are the subject of this lawsuit.

15.  The car was a four-door, gray, 2010 Ford Fusion.

16.  In the early morning hours of June 25, 2018, Maryann Luna requested that Luis Argueta take her to get some food.

17. Maryann and Luis travelled from Maryann's home to Whataburger, which is located in the 6300 block of Stewart Road in Galveston, Texas.

18. Maryann Luna and Luis Argueta arrived at Whataburger at approximately two-fifteen (2:15) a.m., and did not leave until sometime between two-thirty (2:30) and two-forty (2:40) a.m.

19. After leaving Whataburger, Maryann Luna and Luis Argueta travelled to Sonny's Convenience Store, located at 5027 Broadway Avenue in Galveston, Texas.

20. Luis Argueta explained to Maryann Luna that he wanted to purchase some vanilla (Swisher Sweet cigars) from the store.

21. When Luis and Maryann were preparing to leave the convenience store parking lot, they noticed a Galveston Police Department cruiser pull into the parking lot next to them.

22. A short time after the cruiser pulled in, Luis Argueta exited the parking lot and proceeded west on Broadway.  The cruiser pulled out of the parking lot a few seconds later.

23. Argueta's conduct in the store was legal conduct.

24. Argueta exiting the store's parking lot was legal conduct.

25. Argueta's driving to the residence a few blocks away, taking a familiar route through the alleyway, was legal conduct.

26. Luis Argueta and Maryann Luna did not see the police again until they were located in the area of 53rd Street and Avenue L, near the residence to which the two were returning.

27. After the police cruiser activated its lights, Luis Argueta pulled his vehicle over, in close proximity to the residence.

28. Family and close friends say Luis Argueta was deathly afraid of police in general, and Galveston Police Officers in particular.

29. Luis Argueta's national origin is Hispanic.

30. Luis Argueta was of the generation of young men of color who are conscious of their disparate treatment at the hands of the police, to the extent that he created a social media post one day proclaiming justice and freedom from police abuse.

31. When he pulled the car over, Luis Argueta became extremely anxious.

32. Luis Argueta told Maryann Luna that he had to leave.

33. Prior to Luis Argueta opening the door and running, a frightened Maryann Luna pled with him to stay put.

34. However, Luis Argueta's fear of the police was such that he left the safety of the vehicle and ran, into an open lot and away from the police.

35. The portion of the vacant lot that Luis Argueta ran into was bordered by two metal fences, enclosing a narrow strip of land, which is approximately twenty feet wide at the point where Argueta entered.

36. At the time Luis Argueta left the vehicle, there were citizens in the area who witnessed Argueta's flight and the two Galveston Police Officers who gave chase on foot.

37. Witness 1, an unknown person to Luis Argueta and Maryann Luna, explained he saw an officer approximately twenty feet behind Luis.

38. According to Witness 1, Luis Argueta was running away from the officers when he was shot.

39. Witness 1 did not see Luis Argueta turn toward the officers or otherwise make any sudden or threatening movements.

40. Argueta never pointed any weapon at the officers.

41. According to Witness 1, the shooting officer's only verbal warning to Luis Argueta, prior to shooting, was to yell "Stop! Stop!"

42. According to Witness 1, after yelling "Stop! Stop!" the pursuing officer shot Luis Argueta twice, in the back.

43. Witness 1 stated if the officers were aware of Luis Argueta's criminal history, then they should also have known that he stayed close to the place

where he was shot: "they didn't have to shoot him!  They could have just gone by his house later and picked him up!"

44.  Witness 2, an unknown person to Luis Argueta and Maryann Luna, stated that Luis Argueta did not have a gun when the officer shot him, and said "it did not make sense to shoot him.  All he did was run away."

45.  Witness 2 stated he heard the officer yell "stop," and then the officer fired two shots.

46.  Witnesses explained a frantic search took place in the lot after the shooting.

47.  Witnesses saw an officer hold up an old, rusty knife retrieved from along the fence line.

48.  The observations of Witness 3, who was on Avenue L at the time the shooting took place, and who is a person unknown to Maryann Luna and Luis Argueta, are consistent with those of Witness 1 and Witness 2.

49.  Witness 3 was sitting in his truck, parked on Avenue L, at the time of the shooting.

50.  Witness 3 informed an officer that he had observed what happened.

51.  Witness 3 waited to be interviewed for approximately two hours.

52.  None of the officers at the scene interviewed Witness 3 or took a statement.

53.  No one asked Witness 3 for his name.

54.  No one asked Witness 3 for his contact information.

55.   No one attempted to obtain or preserve this witness' firsthand knowledge of the shooting.

56.   The officers who gave chase were Defendant Jaradi and his partner, Officer M. Larson.

57.   Defendant Jaradi fatally shot Luis Argueta.

58.   The Galveston County Medical Examiner's Report (Erin A. Barnhart, M.D.) revealed Luis Argueta was shot twice: both penetrating and perforating gunshot wounds of Luis Argueta's torso, with a back-to-front trajectory. One wound was a perforating gunshot wound inches under the decedent's left shoulder; and one wound was a perforating gunshot wound inches under the decedent's right shoulder; both wounds indicated that the path of the bullet took a slightly upward trajectory.

59.   Subsequent newspaper reporting revealed a firearm was taken from the scene.  Newspaper reports attributed quotes to the Galveston Police Department (GPD) representatives, who assigned the gun to Luis Argueta.

60.   At the time of the subject events, Witness 4 lived diagonally across the street.

61.   Witness 4, Dazzyle Alaniz, heard the gunshots thirty minutes after she had lain down to go to sleep.  She got up when she was informed that someone had been shot.

62. Alaniz went outside onto her porch; observed the scene for 10-12 minutes, streaming a video feed of the scene to Facebook Live, before being told to go back inside and put the camera away.

63. Alaniz explained later to an investigating officer that she did not see the officers attempt to administer CPR, or any type of aid, to the then-unidentified person on the ground.

64. Sharon Ann Capoferri and Thomas Wilbur Scarborough, Jr. lived at 5309 Avenue L; at the time of the subject events, they were lying on their front porch; they were in the process of renovating their home, and had been sleeping on the porch.

65. Capoferri and Scarborough both heard footsteps and heard the officers yelling repeatedly, "Get on the ground." They then heard two gunshots.

66. Capoferri and Scarborough heard Argueta ask the Defendant "why did you shoot me?"

67. The Defendant did not respond.

68. Scarborough related that he overheard one of the officers ask Argueta his age; Argueta responded that he was eighteen (18).

69. Scarborough said Argueta laid on the ground for twelve minutes after being shot.

70.   During this twelve-minute time span, Argueta repeatedly pled to be taken to the hospital.

71.   Scarborough observed an officer applying pressure to Argueta's left shoulder.

72.   At 3:42 a.m. on June 25, 2018, Luis Fernando Argueta died, at the University of Texas Medical Branch, Galveston, as the result of the gunshot wounds.

73.   The medical examination revealed Luis Argueta to be a Hispanic male; 66 inches tall; 176 pounds; and whose appearance was consistent with his reported age of 18.

74.   The Galveston County Medical Examiner's Office ruled Luis Fernando Argueta's death to be a homicide.

75.   Homicide under the Texas Penal Code Chapter 19 is defined as, "A person commits criminal homicide if he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual."

76.   Galveston Police Reports state that a firearm was taken from the scene.

77.   Officer J. Pitts authored a Supplemental Report in which he identified a black Glock handgun with an extended magazine, lying on the ground a few feet from where Luis Argueta was lying.

78. The Supplemental Report by Officer C. Thompson provides that Thompson arrived at the scene at approximately 3:04 a.m.  Officer Thompson exited his vehicle with a First Aid Kit and applied a dressing to Argueta's wounds.  He applied pressure for approximately one minute prior to the arrival of EMS personnel.

79. In Sergeant L. Caldwell's Supplemental Report, Caldwell identified himself as the first backup at the scene. Caldwell stated he arrived at 3:00 a.m.

80. Caldwell identified Luis Argueta lying on the ground, bleeding, in a vacant lot on the south side of Avenue L. Defendant Jaradi was standing over Luis Argueta with his gun drawn, giving Argueta verbal commands.

81. Caldwell's Supplemental report provided that Defendant Jaradi told Caldwell that Argueta had not yet been handcuffed; Caldwell then placed handcuffs on Argueta.

82. Caldwell asked Argueta how old he was.

83. Argueta attempted to tell Caldwell his name, but his response was inaudible.

84. Caldwell stated he observed a Glock 21 .45 caliber pistol on the ground approximately six feet south of Argueta.

85. Caldwell contacted Lieutenant Ochoa via radio, and advised dispatch to notify ID, CID and IAD.

86.  Caldwell travelled back to the Galveston Police Department headquarters and downloaded the video.  His report stated that the moment of the shooting is not visible on video.

87.  Lt. R. Ochoa arrived on the scene at 3:05 a.m. Lt. Ochoa met with Sgt. Caldwell, who provided Ochoa with general details.

88.  Captain Schirard instructed Ochoa to have a sergeant physically take Officer Jaradi's body camera to the station for download. Ochoa then tasked Caldwell with this assignment.

89.  Caldwell's Supplemental Report indicates that he secured the body cameras for Defendant Jaradi and Officer Larson at 6:00 a.m.

90.  Lt. Ochoa also informed Galveston County Sheriff's Office detectives that there was a possible eyewitness on 53rd Street; Ochoa had noticed the man when she was assisting in securing the outer perimeter at 53rd Street and Avenue L.

91.  Ochoa had spoken with the man (referred to as Witness 3, above) and asked whether she could help him. He advised Ochoa that he had been sitting in his truck and listening to music on his iPad when Luis Argueta's car and then the police vehicle passed by, followed by another police vehicle.

92.  Ochoa asked the man to remain present to be interviewed, and advised several of GPD officers inside the perimeter that the man was a possible eyewitness and would be remaining to speak to a detective.

93.  Ochoa later discovered that no one had spoken with the gentleman. He had waited at the location for approximately an hour and a half after Ochoa asked him to stay.  One of GPD officers saw him drive away approximately five minutes after Ochoa reminded a detective of the possible witness and returned to the location.

94.  The name of the witness identified in paragraphs 90-93 remains unknown.

95.  Officer Larson conducted a walk-through for officers with the GCSO (Det. Remmert, CSI Det. Kilburn); Galveston County District Attorney's Office (ADA J. Ott, DA Investigator Sims); GPD (Sgt. Millo, Det. M. Morrison) and a TMPA Counsel (G. Cagle).

96.  Larson stated he had observed the suspect's vehicle, which he described as a black sedan, stop in the alleyway between Avenue L and Avenue M, appearing to drop someone off.

97.  Officer Larson advised the suspect's vehicle began to speed away and a traffic stop was attempted on the vehicle for approximately 1 – 1 ½ blocks.

98.  Larson advised the vehicle pulled over at the 5300 block of Avenue L and he observed the driver of the vehicle exit and run towards the scene.

99. Larson advised Officer Jaradi fired two shots and the suspect fell to the ground with a firearm in his right hand.

100. Larson advised verbal commands were given to the suspect to drop the weapon to roll over.  These instructions and commands were given after Luis Argueta had been shot twice.

101. The Supplemental Report prepared by Detective Morrison (GPD) reviewed Defendant Jaradi's Bodycam video footage.

102. Morrison's report provides the Bodycam was turned on at 2:59:03 a.m. Once the Bodycam is turned on, according to Morrison's report, the camera automatically picks up the two minutes immediately prior to activation, without audio. Accordingly, the Bodycam started recording at 2:57:03 a.m., without audio.

103.  Morrison's report states that the first two minutes of Defendant Jaradi's Bodycam footage show Argueta, in a black shirt, red shorts, and black shoes, running across the 5300 block of Avenue L.

104. Defendant Jaradi gives chase. Both enter a dark, empty lot, not lit by artificial light.

105. The Supplemental Report lists the commands given to Luis Argueta, after he had been shot and was lying on the ground, including "hands up," and "drop it."

- 14 -

106. Morrison's November 6, 2018 report opines that the Bodycam had not been activated because Defendant Jaradi "did not have time" to do so prior to shooting Luis Argueta, explaining away the absence of the critical audio recording.

107. It is unknown whether the Bodycam equipment permits officers the ability to alter the data contained thereon, or whether any such alteration results in metadata tags; however, this information is the subject of further investigation and discovery.

108. None of the video and/or audio recordings related to these events has been made available at the time of the preparation and filing of the instant complaint.

109. Morrison's report also notes that Argueta begged to be taken to the hospital.

110. Morrison also reviewed Officer Larson's Bodycam footage.

111. Based on the report, it appears as though Defendant Jaradi and Officer Larson turned their Bodycams within seconds of each other; Officer Larson turned his Bodycam on at 2:59 a.m.; Officer Larson's Bodycam video commences at 2:57 a.m.

112. At 2:57 a.m., Larson exits the front passenger door of the patrol unit and begins chasing Luis Argueta.

113. Officer Larson's Bodycam footage audio commences at 2:59 a.m.; the audio catches the sound of two gunshots at 2:59:03 a.m.

114. Morrison's Supplemental Report does not attempt to explain away Officer Larson's failure to immediately activate his Bodycam.

115. Morrison's report states that Officer Larson shone his flashlight on Luis Argueta, who was lying on his back with his feet toward Officer Larson, and states that the video shows Luis Argueta raising his left arm in the air and his right hand in an upright position, gripping a black firearm.

116. Larson gives instruction to drop the firearm. Argueta complies.

117. Larson then instructs Argueta to turn over; Argueta rolls over on his left side, then onto his stomach. Jaradi kicks the firearm away.

118. On July 2, 2018 the Records Division for GPD gathered all "C-Shift bodycam and MVR footage" related to the subject incident.

119. Morrison's Supplemental Report also reports that unit #1707 WatchGuard MVR footage shows the unit travelling through the neighborhood and conducting a U-turn, then travels through an alleyway; shows a vehicle traveling westbound in the alley ahead of patrol unit and turning north onto the 1300 block of 52nd Street; on 52nd Street, the patrol unit's emergency lights activate; the vehicle's left turn signal activates, and it continues to travel down the 5200 block of Avenue L, through the intersection of 53rd

Street and Avenue L, pulls over mid-block.  This description, contained in the report, has not been independently verified by review of the MVR footage, which has not been provided.

120. At the time that the patrol unit activated its lights, Luis Argueta and Maryann Luna were less than two blocks from home; Luis Argueta drove approximately a block before stopping, and parked near the residence.

121. Morrison's report states that Luis Argueta is observed exiting the front driver door and running south, away from the vehicle, with his left side to the camera, and his left arm moving up and down in a normal running motion; the camera angle does not show his right side.

122. After the vehicle stopped, Jaradi advised dispatch of the traffic stop and provides the vehicle license plate number.

123. The Glock 21 45 caliber pistol retrieved at the scene bears a serial number VXF347. The pistol's slide was in a closed position. The pistol contained an extended magazine with a thirteen-round capacity.

124. The Glock 21 45 caliber, serial number VXFC347 did not have any ammunition/rounds in the chamber of the pistol.

IV.   FOURTH AMENDMENT CLAIM

125. Plaintiff suffered an injury, which resulted directly and only from the use of
force; the degree of force exerted was clearly excessive; and the
excessiveness of the force was clearly unreasonable.

126. The injury was caused by the act of Defendant Jaradi firing his weapon and
shooting Luis Argueta as he fled on foot, away from, and with his back
toward, the Defendant.

127. At no time did Argueta move or gesture toward Defendant Jaradi, or his
partner, Officer Larson, in a threatening manner.

128. At no time did Argueta slow or look over his shoulder or make any gesture
toward Defendant Jaradi whatsoever.

129. At the time of stop, Jaradi identified the stop to dispatch only as a "traffic
stop."

130. Per Officer Morrison's Supplemental Report as to video recordings, Officer
Larson stated that he did not see a weapon in Luis Argueta's possession.

131. The video description provided by one supplemental report stated Argueta
ran in a normal gait.

132. A witness at the scene said the boy had run with his back to the officer; the
officer was quite a ways back from him; and that the officer just "shot him
down like a dog."

133. The witness also explained the child was not running at an angle; this is supported by the fact that the portion of the vacant lot that Luis Argueta ran into was only about twenty feet wide.

134. Defendant's Jaradi's description of events is also belied by the trajectory of the bullets (back to front, with an upward trajectory); the lot comprises relatively level ground, and Luis Argueta was only five feet, six inches tall, per the medical examiner's report.

135. Luis Argueta pulled his vehicle to a stop after the lights were activated by the officer(s).

136. Argueta was not speeding, and activated his turn signal prior to stopping the vehicle.

137. Defendant Jaradi could not reasonably have believed that deadly force was immediately necessary to effectuate an arrest.  Luis Argueta was running away from him.  Luis Argueta made no threatening moves toward him. There was no indication that Luis Argueta posed a substantial threat of harm to Defendant, or to any other person(s).  According to witnesses, the only comments by Defendant Jaradi were "get down" and stop."   Any other instructions took place after the Defendant shot Luis Argueta twice in the back.

138. The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

139. The excessive use of force by a law-enforcement officer on an individual "in the context of an arrest or investigatory stop" constitutes an "unreasonable seizure" of the individual, in violation of the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 394, 109 S. Ct. 1865, L. Ed. 2d 443 (1989).

140. The illegal tracking of Luis Argueta and Maryann Luna, which led to Argueta's seizure, was solely attributable to Argueta's national origin, while he was engaged in legal conduct – visiting a convenience store; buying cigars; speaking with individuals at the convenience store; driving away; driving down an alleyway – and in turn deeming this conduct to be illegal, in violation of *Terry v. Ohio* and its progeny, and in violation of Argueta's Fourth Amendment rights under the United States Constitution.

V.      – <u>COURSE AND SCOPE, COLOR OF LAW</u>

141. At all times materials to this cause of action, Defendant Jaradi was employed
     by the Galveston Police Department.

142. Defendant Jaradi was hired by the Galveston Police Department on May 24,
     2016.

143. At all times materials to this action, Defendant Jaradi was working under the
     color of law.

144. On June 25, 2018, Defendant Jaradi used deadly force against Argueta,
     causing Argueta's death.

VI.      – <u>POLICY, CUSTOM, PRACTICE, WHICH LED TO LUIS
         ARGUETA'S DEATH</u>– 42 U.S.C. SECTION 1983

145. Defendant City of Galveston is a municipal corporation under the laws of
     the State of Texas.

146. The shooting of Luis Fernando Argueta, on June 25, 2018, was the
     byproduct of the City of Galveston's policy, custom, and practice in
     protecting its officers in general and the use of excessive force in particular.
     The following examples are illustrative in this regard:

     a.  <u>Failure to properly document and report use of force in violation of
         State law</u>, and when discovered, meting out minor punishment to the
         offending officers (*see Brandon Backe v. City of Galveston*, 2 F.
         Supp. 3rd 988 (2014); in 2018 this pattern occurred a number of times:

i) letter to GPD from Galveston County Sheriff's Department
(Captain Walker) complaining about an incident of excessive force
that had been caught on video, and where a GPD Officer had
subsequently failed to complete Use of Force documentation pursuant
to state law; ii) in the case the subject of this complaint (2018), failure
to report to the State Attorney General's Office, in violation of State
law; iii) 2018 incident involving Officer Doucette, use of force at
UTMB Emergency room; handcuffed citizen (Kresal) thrown to
ground while taking inside to be blood tested, no IAD number
assigned.

b. <u>Targeting minority citizens on the basis of race and national origin</u>
leading to some unforeseen and unconstitutional events. Examples of
this include i) traffic stop of retired Officer Patrick Mullins; after Mr.
Mullins stopped on Avenue J (Broadway) and pulled onto 19th Street
at 3:10 a.m., a police unit pulled in behind him.   Mr. Mullins turned
on his inside lights in his truck; when the officer approached, Mr.
Mullins put his left hand up to shield his vision from the officer's
flashlight, which the officer was shining in his eyes.  Mr. Mullins was
wearing a black t-shirt which read POLICE, written in white letters.
When Mr. Mullins exited the vehicle, he was told to place his hands

on the vehicle. Mr. Mullins informed the officer he was retired GPD, took his hands off the vehicle and was told to place his hands back on the vehicle. The officer then grabbed Mr. Mullins' hands to handcuff him; when Mr. Mullis inquired as to why he was being cuffed, the officer told Mr. Mullins that he was being belligerent and that he "should be ashamed" of how he was acting.  Mr. Mullins was not released until he asked for a supervisor to come to the scene; ii) 2013 – Reginald Davis, an African American man, was charged with assault on public servant when, after being approached on Seawall Boulevard, he ran toward the ocean; as he reached the water, he was shot with a taser gun by Officer Santos; Santos jumped on Mr. Davis' back and started choking him under the water, while holding his hands behind his back; Mr. Davis was kicked in the head and in the face; he stated that he had believed that the officers were going to kill him.  A complaint was filed, but no IAD number was assigned; iii) Terry S. Cossey, African American male, brought complaint on August 30, 2013, complaining he was in the process of packing his car when surrounded by 10-15 officers and held at gun point, without identification; Mr. Cossey was handcuffed and detained in the back of police car; Mr. Cossey's wife and daughters were ordered out of the

car and told to place their hands on back of the (very hot) car; Mr. Cossey and his family were ultimately released, and were told they had been identified by someone in the restaurant. No IAD number assigned; iv) 2014 complaint – Bobby Wilson, Black male, complained on April 21, 2014 for an incident which took place on April 3, 2014; Mr. Wilson charged with resisting arrest, and interfering with public duties; after attending court, Mr. Wilson stopped while riding his bicycle on 29th Street, was told to put his hands behind his back, and was arrested again; Mr. Wilson was never told why he was subsequently arrested; no IAD number assigned; v) Alex Johnson, an African-American male, filed a complaint on May 6, 2014, for an incident which took place on April 28, 2018; as a citizen and resident, walking down 31st Street, he was asked for his name and subsequently arrested for public intoxication; no IAD complaint number assigned;  vi) Amber Guarnelo, Hispanic female, filed a complaint on January 13, 2014 for an incident which occurred on January 13, 2014; her door was kicked in by narcotics agents; her child's father was taken into custody on the allegation that there as resideue on the kitchen table; D.A. later sent a letter saying 0% cocaine had been found in the sample of the supposed "residue;"

however, her child's father had already served a six-month sentence; no IAD report number assigned; vii) Damion Griffin, African American male; date of report December 11, 2014; date of incident – November 11, 2014; Mr. Griffin was working as off-duty police transport; Sgt. Caldwell arrived to the scene and told him he was "blocking traffic;" three other escorts were also "blocking traffic;" when Mr. Griffin mentioned this, Caldwell mocked him as a "tough guy;" ticketing and detaining him in the back of the patrol car for a length of time and then releasing him; when Mr. Griffin complained about the ticket, Caldwell detained him in the back of the patrol car again; another officer let Mr. Griffin go; no IAD number assigned; viii) Manuel Carranza, Hispanic male; working at 2402 Avenue O ½; an officer entered the building and asked what Mr. Carranza was doing there; officer handcuffed him; another person had to vouch for Mr. Carranza to avoid being arrested; no IAD number assigned; ix) Elizabeth G. Holtel, African American female; charged with public intoxication and arrested after she had stopped to rest under a tree on hot day after walking; Ms. Holtel spent the night in jail; no IAD number assigned; x) Daniel Routree [race unknown]; beaten in custody by GPD Officer Doucette while handcuffed, Officer Doucette

was stopped by another officer; assigned IAD number 16-000600;

Billy Wayne Platt (race unknown; finding in 2017; date of incident

unknown; attached while being transported in the Sally Port by

Officer C. Doucette; he was beaten/knocked unconscious after getting

into dispute; citizen was detained in handcuffs); no IAD number

assigned.

c. Permitting a practice of "jump-out vans:" i) GPD Narcotics (incident

in August 2013),  Jessica Casazza complained Officers Perez and

Cadena pulled up, jumped out of the vehicle and told her and her

boyfriend's sister to put their hands behind their backs, they were

under arrest; they were thrown to the pavement for complaining and

were arrested for public intoxication; no IAD number assigned;  ii)

Angela Parfait, White female; May 23, 2014 report for a May 6, 2014

incident; walking down 34th and Avenue M, unknown man jumped

out of white van; tackled, kicked, punched and choked her; later

learned the man was GPD Task Force; No IAD number assigned; iii)

Andre Famer (African American male) complaint directed against

jump out van and racial profiling; complaint harassing me because of

my past; IA number assigned 16-016; iv) Francisco Ruiz, Hispanic

male, officers entered house without probable cause and told my

guests to leave my home; complained, went into kitchen and poured

out all alcoholic beverages; IA 16-0047; Dymond Milburn, African

American child; 12-year-old experienced "jump-out-van" violence;

agents physically attacked the child while she was playing in her front

yard, and accused her of being a prostitute; incident occurred in 2006.

144. The practical effect of the practices, policies and customs mentioned above

show the failure to track use of force in accordance with State law, by

failing to make the required reports and/or fill out the required

paperwork; failing to identify excessive force and turning a blind eye to

egregious conduct (this has been demonstrated by other agencies' having

been required to call the GPD out for the GPD's excessive use of force in

the presence of other agencies); the Galveston officers' willful failure to

follow department policy and state law, creating an atmosphere of fear in

the minority community and causing children and adults to flee when the

police approach them or stop them, taking the safer path of fleeing, and

creating circumstances where impermissible conduct is permitted,

leading to unconstitutional action and violations of citizens' rights.

145. These policies, practices and customs are the moving force for the violation

of Plaintiff's and others' known constitutional rights.

147. The policies and law regarding reporting are designed to make a police

officer mindful of when it is proper to use deadly force and/or any force when interacting with another human being.  Failure to document, properly investigate or charge officers for violations of citizens' constitutional rights are also moving forces leading to the wrongful death of Luis Argueta.

148. Outside of this case, an example of the importance of properly monitoring the use of force shows up the incident labeled IA16-0011, wherein Officer Doucette employed force. At the time, Doucette had 121 incidents in which he had used force 9 times; this equated to Doucette using force once in every thirteen or fourteen arrests. This incident's report concluded that the Department's use of force was "average."  Unfortunately, because the department's policy, custom and practice is not to report and document consistent with State law, this is not a reliable conclusion.

148. Defendant City of Galveston is jointly and severally liable for its violation of decedent's constitutional rights against the use of excessive force and against illegal searches and seizures, pursuant to the Fourth Amendment of the United States Constitution and 42 United States Code section 1983.

VII.   – CLAIMS FOR DAMAGES

149. Plaintiffs sue for the following:

1.      Pain and suffering, compensatory damages – suffered by Luis Argueta prior to his death;

2.      Survivorship damages for surviving heirs, including the loss of fraternal love, affection, and support; emotional distress; loss of filial love, affection, and support; emotional distress; and loss of economic support in the future;

3.      Burial expenses;

4.      Reasonable and necessary attorneys' fees;

5.      Prejudgment and post-judgment interest;

6.      Costs of court.

VIII.  – Prayer and Conclusion/Jury Trial is Demanded

150. Plaintiffs pray Defendant be cited to appear herein and after citation and discovery, that Plaintiffs be afforded a trial by jury;

151. Plaintiffs pray for all legal and equitable relief to which they may be entitled, under law or in equity.

Respectfully submitted,

/s/ Gene A. Watkins

_____

Gene A. Watkins
Federal I.D. No. 1129993
State Bar Roll No. 24058954
Sherman Watkins PLLC
gwatkins@shermanwatkins.com
1418 Washington Avenue
Houston, Texas 77002
Telephone: 713.224.5113
Facsimile: 866.560.8676

/s/ Ellyn J. Clevenger
_____

Ellyn J. Clevenger
1115 Moody Avenue
Galveston, Texas 77550
409.621.6440
ellynclevenger@gmail.com
STATE BAR NO. 24058662

ATTORNEY FOR PLAINTIFFS