IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

SANTOS ARGUETA, BLANCA
GRANADO, DORA ARGUETA,
AND
JELLDY ARGUETA,                          CIVIL ACTION NO. 3:20-CV-367
INDIVIDUALLY
AND ON BEHALF
OF THE ESTATE OF
LUIS FERNANDO ARGUETA,
    PLAINTIFFS,

V.                                                JURY

CITY OF GALVESTON AND
OFFICER DERRICK S. JARADI,
    DEFENDANTS.


PLAINTIFFS, SANTOS ARGUETA, BLANCA GRANADO, DORA
ARGUETA, AND JELLDY ARGUETA, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF LUIS FERNANDO ARGUETA'S,  RESPONSE TO
DEFENDANTS, CITY OF GALVESTON AND OFFICER DERRICK S.
JARADI's, MOTION FOR SUMMARY JUDGMENT

  Plaintiffs, Santos Argueta, Blanca Granado, Dora Argueta and Jelldy

Argueta, Individually and on behalf of the Estate of Luis Fernando Argueta, file

this response to Defendants, City of Galveston and Officer Derrick S. Jaradi's,

Motion for Summary Judgment. Plaintiff would show unto the Court as follows:

  1. Summary Judgment Standard.

  Rule 56 of the F.R.C.P. governs summary judgment, If the movants in

this case show there is no genuine dispute as to any material fact, movants are entitled to summary judgment as a matter of law. In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis- for the motion and identifying those portions of the pleadings … [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.T. 2548, 2553 (1986).

If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts, to prove that a genuine issue of material fact exists. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554; *also see Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little,* 37 F.3d at 1075. Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of proof, assume that the nonmoving party could or would prove the necessary facts." *Id.*

The foregoing is a well-known recitation of the summary judgment standard, and of the obligations of the movant(s) and nonmovant(s) under Rule 56, *Celotex,* and its progeny. It is Plaintiffs' position, in this response, that the underlying evidence, facts, and caselaw support denial of the Defendants' motion.

2.  <u>Statement of Facts</u>.

The facts herein trace Plaintiffs' Original Complaint on file with the Court (doc. 1) and/or supplemented with additional facts determined in discovery, admitted by Defendants, or established by extrinsic evidence.

It is no dispute this Court has jurisdiction of the civil rights and wrongful death claim brought by Plaintiffs.[1] At all times material to the complaint, the City of Galveston is a municipality under Texas law[2] and is the employer of police officer, Derrick S. Jaradi.[3]  Jaradi was an employee of the Galveston Police Department at the time of the complained of events, and remains an employee at the time of filing this response; Jaradi is therefore subject to the Galveston Police Department's Rules and Regulations.

The Galveston Police Department's Policy Manual makes it quite clear, both to its employees and the general public, that ignorance of the departmental

---

[1]Plaintiffs' Original Complaint (doc. 1, ¶¶ 1-5). Defendants' Defenses, Answer and Jury Demand (doc. 11, ¶ 10).
[2] Defendants' Defenses, Answer and Jury Demand (doc. 11, ¶12.
[3] Attachment 2, deposition excerpts of Derrick Jaradi at 3, lines 3, 21-25; 4, 1, 25.

rules is not an excuse.[4]  The City of Galveston Police Department is required by Texas law to train its officers, ensuring knowledge of its rules and regulations, as well as the laws protecting citizens and the department/city.[5]

**A late-night trip to visit family; a fast food restaurant; a convenience store; and then home**

On June 24, 2018, Luis Argueta picked up his girlfriend, Mary Ann Luna, in a vehicle owned by Luis Argueta's friend.  Mary Ann didn't remember what time Luis picked her up.[6]

Luis and Mary Ann traveled to Mary Ann's sister's home; then to the What-a-Burger Restaurant located on Stewart Avenue and 63rd Street; and then to Sunny

---

[4] Attachment 1, excerpts from Policy Manual for City of Galveston Police Department. Under Purpose and Scope the following language is found:

> The Galveston Police Department Manual us hereby established and shall be referred to as the "manual" The manual is a statement of the current riles, procedures, and regulations of the Department. All employees are to conform to this manual. [106.1. Purpose and Scope]

> Responsibilities: The ultimate responsivities for the contents of the manual rests only with the Chief of Police. [106.2]

Sections 106.3.4 and 106.4 mandates that each employee acknowledges in writing that he/she has been provided access and the ability to review the Department Manual and that, as a condition of employment or appointment, all members are required to read and obtain necessary clarifications of the department rules, regulations and procedures.  All employees are required to sign a statement acknowledging receipt of a copy or provision of access, and are responsible for reading and becoming familiar with its contents.

[5] TEX. ADMIN. CODE, Rule §217.1 (Minimum Requirements for Licensure as a Texas Peace Officer or County Jailer).

[6] Attachment 3, deposition excerpts of Mary Ann Luna at 17, lines 22-24.

Food Mart at 5027 Broadway; all of these stops were located in Galveston, Texas.[7] Luis and Mary Ann stayed at Mary Ann's sister's home for twenty to thirty minutes.[8]  At What-a-burger, the couple went through the drive-through.[9]

The couple's first interaction with the police was at Sunny Food Mart.  Luis went into the store to get a cigar ("a vanilla").[10]  Mary Ann Luna did not remember noticing anyone standing outside the store; she testified Luis spoke with the clerk inside the store, but did not talk to anyone when he exited.  Luis came out of the store holding a single "vanilla" cigar.[11]

Mary Ann explained the police car drove into the parking lot "[b]efore he [Luis] got in the car, it was a cop car pulled up in the parking lot almost next to his – almost next to the car."[12]  Mary Ann testified that when the officers pulled in, Luis had been in the store.[13]  Mary Ann recalled she recognized the officer in the

---

[7] Defendants' Defenses, Answer and Jury Demand (doc. 11, ¶14-15). The department ran the registration post-event, determining the vehicle was not stolen; it was registered to Melissa Michelle Naranjo.  Luis Argueta had borrowed the vehicle. Defendants' Defenses, Answer and Jury Demand (doc. 11, ¶14). Mary Ann Luna's deposition testimony was she knew the decedent didn't have a car, and that she didn't know who the car belonged to. Attachment 3, deposition excerpts of Mary Ann Luna at 23, lines 11-25).

[8] Attachment 3, deposition excerpts of Mary Ann Luna at 26, lines 17-21.

[9] Attachment 3, deposition excerpts of Mary Ann Luna at 27, lines 18-21; 28, lines 1-4.

[10] Mary Ann Luna described a "vanilla" as being "like a cigar."  Attachment 3, deposition excerpts of Mary Ann Luna at 3.

[11] Attachment 3, deposition excerpts of Mary Ann Luna at 35, 5-10, 20-23; 36, lines 5-9.

[12] Attachment 3, deposition excerpts of Mary Ann Luna at 36, lines 10-20.

[13] Attachment 3, deposition excerpts of Mary Ann Luna at at 74, lines 10-12.

passenger (whom she identified as Jaradi, not Larson) as "the cute white cop" who patrolled her neighborhood.[14]

Mary Ann said the officers were looking at Luis "like something was wrong."[15]  Mary Ann told Luis that the officers were "looking at you [Luis] crazy[.]"[16]  This made Luis nervous.[17]  Mary Ann later described the way the officers were looking at Luis as "staring at him […] like a mean face."[18]  When Luis Argueta exited the parking lot, he exited via the side street; he was not fleeing but driving "super slow[;]" in fact, because he was nervous, he first put the car into neutral instead of drive by mistake.[19]

### Mere presence invoked suspicion

Mary Ann described legal activity by herself and Luis. Defendant Jaradi and his partner, Matthew Larson, present a different set of facts. Notably, under established summary judgment standards, the initial foundational interaction between the parties is part and parcel of presentment of a material issue of fact.

### The officers' conflicting versions

---

[14]Attachment 3, deposition excerpts of Mary Ann Luna at 37, lines 24-25; 48, lines 19-23; 49, lines 7-10; 75, 8-15.
[15] Attachment 3, deposition of Mary Ann Luna at 37, lines 24-25.
[16] Attachment 3, deposition of Mary Ann Luna at 38, lines 2-4.
[17] Attachment 3, deposition excerpts of Mary Ann Luna at 37, lines 21-25; 38, lines 2-8; 73, 25; 75, lines 1-4, 10-12, 18-25.
[18] Attachment 3, deposition excerpts of Mary Ann Luna at 74, lines 21-23.
[19]Attachment 3, deposition excerpts of Mary Ann Luna at 77, lines 12-14

Defendant Jaradi testified that he and Larson were traveling eastbound on
Broadway Avenue, when Jaradi saw a female with pink hair, with whom he had
interacted in the past, and who had told Jaradi she engaged in prostitution.[20]  Jaradi
then hedged his bet, testifying that he did not remember when he had interacted
with this female; what was the exact nature of the call; or whether it was in fact the
same female.  Jaradi just remembered the interaction occurred on the east end of
the Island.[21]  When pressed, Jaradi also admitted he did not take a report and that
no charges were filed.[22]  With respect to pinpointing a range of time during which
his previous interaction with the female may have taken place, Jaradi stated that it
may have been a few weeks before June 25, 2018, but also may have been a few
months.[23]

Jaradi stated "I thought to myself, I wondered if that was the same lady,
prostituting again because it was kind of late at night."[24]  When asked about the
race of the female he said had been standing outside the store (black or white),
Jaradi said he didn't notice her race, but said "I thought she was white."[25]

Jaradi said he passed the store, made the block, and turned into the store's
parking lot from Broadway Avenue. He believed he recalled the female had gone

---

[20] Attachment, deposition excerpts Derrick Jaradi at 12, lines 5-12; 22-25;13, lines 102, 7-16.
[21] Attachment 2, deposition excerpts Derrick Jaradi at 13, lines 17-25; 14, lines 1-7.
[22] Attachment 2, deposition excerpts Derrick Jaradi at 14, lines 8-20.
[23] Attachment 2, deposition excerpts Derrick Jaradi at 14, lines 21-25; 15, lines 1-4.
[24] *Id.*
[25] Attachment 2, deposition excerpts Derrick Jaradi at 15, lines 12-19; 16, line 1, lines 8-20.

into the store when he circled back around.[26]  Jaradi said he didn't notice the

vehicle Luis Argueta was driving because he was focused on the female; meaning

he also had not noticed Luis Argueta or Mary Ann Luna "I was focused on the

female."[27]

Jaradi did not see Argueta's vehicle exit but said Larson had explained to

him the gray/green vehicle had sped off at a really high rate of speed."[28]  Not only

did Jaradi not notice the greenish-gray vehicle or its occupants, he did not

remember whether there were any other vehicles in the parking lot, or whether

there were any other persons in the parking lot.[29]

Jaradi exited the parking lot to search for Luis and Mary Ann's vehicle.

Jaradi did not activate his vehicle's dashcam,[30] nor did he activate his lights. Jaradi

explained he was not familiar with the City of Galveston having a dashcam policy

requiring manual activation.[31]  When the patrol car moved onto the roadway, Luis'

vehicle was not in sight.[32]

---

[26] Attachment 2, deposition excerpts Derrick Jaradi at 19, lines 15-19.

[27] Attachment 2, deposition excerpts Derrick Jaradi at 20, lines 1-4; 22, lines 7-10., lines 8-20.

[28] Attachment 2, deposition excerpts Derrick Jaradi at 20, lines 1-4.

[29] Attachment 2, deposition excerpts Derrick Jaradi at 23, lines 18-25; 24, lines 1-4.

[30] In-car audio/video cameras are referred to as "Mobile Vehicle Recorders" or "MVRs" in the Galveston Police Department Policy Manual; however, they are referred to herein by their common/colloquial nomination, "dashcam."

[31] Attachment 2, deposition excerpts Derrick Jaradi at 35, lines 25, 36, lines 1-3, 22-25; 27, line 1; 39, lines 12-20.

[32] Attachment 2, deposition excerpts Derrick Jaradi at 25, lines 12-15; 34, lines 17-22.

Officer Matthew Larson's deposition was taken on December 7, 2021. Larson's testimony differed from Officer Jaradi's.  Larson made no attempt to tie his articulated suspicion to a pink-haired woman suspected of engaging in the crime of prostitution.  "Well, I saw the vehicle and told Officer Jaradi that looked suspicious, and we decided to just try and check him out and we turned around om Broadway once we came -- came to a median that allowed us to and turned around and went back to the gas station… [t]there was a – it [the car] was parked right front and center of the gas station and there was a woman standing by the car leaning in and talking to the occupants."[33]

Larson said no one was else around, and "I thought it was possible it was a narcotics transaction."[34]  Larson said he had never seen the woman before, and that he could not see the occupants in the vehicle.[35]  Larson admitted that there was nothing specific about the woman that caused him to believe that she may be soliciting or involved in a drug transaction.[36]  Larsen stated the vehicle pulled out

---

[33]Attachment 4, deposition excerpts of Matthew Larson at 7, lines 17-22; 8 at 1-3.

[34] Attachment 4, deposition excerpts of Matthew Larson at 8, lines 10-11.

[35] Attachment 4, deposition excerpts of Matthew Larson at 6, lines 17-22; 8, lines 1-22. It is as if a totally different offense report is being read by the occupants of the same vehicle, particularly when Jaradi testified he talked to Larson about the woman, telling Larson that the woman was possibly the prostitute that Jaradi had previously had contact with on the east end. Attachment 2, deposition excerpts of Derrick Jaradi at 16, lines 16-21; 19, lines 15-19 ("Well, I was more focused on the female.").

[36] Attachment 4, deposition excerpts of Matthew Larson at 12, lines 15-25; 13, lines 1-24; 14, lines 1-12). Even taking Larson's testimony as entirely true, he articulated his suspicion as follows: a was woman talking to unknown occupants of a vehicle at 3:00 in the morning, in a convenience store parking lot.  The officer could not provide the woman's race, what she was wearing, her approximate age, or whether he had ever seen the woman before.  Larson

of the parking lot immediately when "we pulled in, they [were] in the middle of

leaving."[37]  In his deposition testimony, Larson makes no mention of the vehicle

speeding off.[38]

---

admittedly observed no crime taking place.  The situation described represents entirely legal
conduct. *Id.* Of course, Mary Ann Luna testified to the contrary – there was no such conversation
- creating a wide factual bridge. Larson's articulable suspicion: that there are not very many
people out and about at 3:00 in the morning.

[37] *Id.* at 15, lines 6-8.

[38] In that the issue of articulable suspicion and probable cause are issues in which are part and
parcel of whether a material issue of fact exists, Texas Penal Code, §§14.01, 14.03 are important.
In the description provided by the officers, there was no testimony to support suspected
disorderly conduct or other related offenses, found under Chapter 42 of the Texas Penal Code, or
public intoxication, found under Section 49.02, Texas Penal Code. There was no testimony of an
assault taking place, family violence, interference with an emergency call, or any statement by
the persons (supposed woman standing/leaning on vehicle's windowsill, and supposedly
conversing with Luis Argueta and Mary Ann Luna) or by the occupants of the car (Luis Argueta
and Mary Ann Luna).  There is no factual testimony identifying a felony committed other than
the officer expressing a view that the person (whom Larson testified was standing by the car, and
Jaradi testified was in the parking lot) may have been engaging in a proposed sexual transaction
(prostitution/Jaradi's testimony) or a narcotics transaction.  All that occurred, taking Larson's
testimony as true, was that a person was talking to occupants of a vehicle at 3:00 a.m. in a
parking lot of a convenience store.
    The relevant provisions Sections of the Texas Penal Code:

  Art. 14.01. OFFENSE WITHIN VIEW.  (a)  A peace officer or any other person, may,
  without a warrant, arrest an offender when the offense is committed in his presence or
  within his view, if the offense is one classed as a felony or as an offense against the
  public peace.
   (b) A peace officer may arrest an offender without a warrant for any offense committed
   in his presence or within his view.

    …

  Art. 14.03. AUTHORITY OF PEACE OFFICERS.  (a)  Any peace officer may arrest,
  without warrant:
        (1)  persons found in suspicious places and under circumstances which
        reasonably show that such persons have been guilty of some felony, violation of
        Title 9, Chapter 42, Penal Code, breach of the peace, or offense under Section
        49.02, Penal Code, or threaten, or are about to commit some offense against the
        laws;
        (2)  persons who the peace officer has probable cause to believe have committed
        an assault resulting in bodily injury to another person and the peace officer has

probable cause to believe that there is danger of further bodily injury to that person;

(3)  persons who the peace officer has probable cause to believe have committed an offense defined by Section 25.07, Penal Code, if the offense is not committed in the presence of the peace officer;

(4)  persons who the peace officer has probable cause to believe have committed an offense involving family violence;

(5)  persons who the peace officer has probable cause to believe have prevented or interfered with an individual's ability to place a telephone call in an emergency, as defined by Section 42.062(d), Penal Code, if the offense is not committed in the presence of the peace officer; or

(6)  a person who makes a statement to the peace officer that would be admissible against the person under Article 38.21 and establishes probable cause to believe that the person has committed a felony.

(b)  A peace officer shall arrest, without a warrant, a person the peace officer has probable cause to believe has committed an offense under Section 25.07, Penal Code, if the offense is committed in the presence of the peace officer.

(c)  If reasonably necessary to verify an allegation of a violation of a protective order or of the commission of an offense involving family violence, a peace officer shall remain at the scene of the investigation to verify the allegation and to prevent the further commission of the violation or of family violence.

(d) A peace officer who is outside his jurisdiction may arrest, without warrant, a person who commits an offense within the officer's presence or view, if the offense is a felony, a violation of Chapter 42 or 49, Penal Code, or a breach of the peace.  A peace officer making an arrest under this subsection shall, as soon as practicable after making the arrest, notify a law enforcement agency having jurisdiction where the arrest was made. The law enforcement agency shall then take custody of the person committing the offense and take the person before a magistrate in compliance with Article 14.06 of this code.

(e) The justification for conduct provided under Section 9.21, Penal Code, applies to a peace officer when the peace officer is performing a duty required by this article.

(f)  In this article, "family violence" has the meaning assigned by Section 71.004, Family Code.

(g)(1)  A peace officer listed in Subdivision (1), (2), or (5), Article 2.12, who is licensed under Chapter 1701, Occupations Code, and is outside of the officer's jurisdiction may arrest without a warrant a person who commits any offense within the officer's presence or view, other than a violation of Subtitle C, Title 7, Transportation Code.

(2)  A peace officer listed in Subdivision (3), Article 2.12, who is licensed under Chapter 1701, Occupations Code, and is outside of the officer's jurisdiction may arrest without a warrant a person who commits any offense within the officer's presence or view, except that an officer described in this subdivision who is outside of that officer's jurisdiction may arrest a person for a violation of Subtitle C, Title 7, Transportation Code, only if the offense is committed in the county or counties in which the municipality employing the peace officer is located.

11

**The pursuit**

The City of Galveston Police Department's Policy Manual's pursuit policy is found under Section 214, titled "Vehicle Pursuit." Section 214 provides that officers are required to exhibit a high degree of common sense and sound judgment. Officers must not forget that the immediate apprehension of a suspect is generally not more important than the safety of the public and pursuing officers.[39] A vehicle pursuit is defined in the policy: "an event involving one or more law enforcement officers attempting to apprehend a suspect who is attempting to avoid

---

      (3)  A peace officer making an arrest under this subsection shall as soon as practicable after making the arrest notify a law enforcement agency having jurisdiction where the arrest was made.  The law enforcement agency shall then take custody of:

           (A)  the person committing the offense and take the person before a magistrate in compliance with Article 14.06; and

           (B)  any property seized during or after the arrest as if the property had been seized by a peace officer of that law enforcement agency.

(h)(1) A peace officer who is acting in the lawful discharge of the officer's official duties may disarm a person at any time the officer reasonably believes it is necessary for the protection of the person, officer, or another individual.  The peace officer shall return the handgun to the person before discharging the person from the scene if the officer determines that the person is not a threat to the officer, person, or another individual and if the person has not committed a violation that results in the arrest of the person.

      (2)  A peace officer who is acting in the lawful discharge of the officer's official duties may temporarily disarm a person when the person enters a nonpublic, secure portion of a law enforcement facility, if the law enforcement agency provides a gun locker or other secure area where the peace officer can secure the person's handgun.  The peace officer shall secure the handgun in the locker or other secure area and shall return the handgun to the person immediately after the person leaves the nonpublic, secure portion of the law enforcement facility.

      (3)  For purposes of this subsection, "law enforcement facility" and "nonpublic, secure portion of a law enforcement facility" have the meanings assigned by Section 411.207, Government Code.

[39] Attachment 1, excerpts from Policy Manual for City of Galveston Police Department, see Policy 214 at 79 [Purpose and Scope Section].

arrest while operating a motor vehicle, by using high speed or other evasive tactics, such as disregarding traffic warning signs, stop signs, red lights, driving off the roadway, turning suddenly or driving in a legal manner but willfully failing to yield to an officer's signal to stop."[40]

Luis Argueta exited the parking lot and turned left on 51st Street. He proceeded south for two blocks, and turned into an alley. He did not say anything as he he was driving; "[h]e was just looking around."[41]

Mary Ann asked Luis what was wrong, "what's going on, why you so nervous, like what's going on, like – like you got something in the car, like what's going on."  Luis kept saying "it's not my car."  Mary Ann thought maybe the car did not have insurance.[42]

Luis stopped in the alley behind the house he had resided previously. The vehicle stopped before reaching the intersection of the alley and the street. Mary Ann did not remember whether the lights were on or off.  Mary Ann said Luis was looking for the cops.  She testified Luis told her, "I got to go, I got to go."[43]

Luis drove out of the alley onto the street, turned right, and came to a stop sign. "He stopped a little bit[,]" and turned left on Avenue L.  While Luis and

---

[40] *Id.* at Section 214.2.
[41] Attachment 3, deposition excerpts Mary Ann Luna at 38, lines 12-22; 39, lines 3-5.
[42] Attachment 3, deposition excerpts, Mary Ann Luna at 39, lines 6-7.
[43] Attachment 3, deposition excerpt, Mary Ann Luna at 39, lines 15-25; 40, lines 1-25; 41, lines 1-11).

Mary Ann were on L, Mary Ann noticed that the cops had turned on their lights. Mary Ann related she saw the lights through the mirror. Luis kept repeating, "I got to go, I got to go" and alternatively stated, "it's not my car."

When Luis pulled over and stopped, he pulled out a gun. Mary Ann asked him whose gun was that; Luis responded, "it's not my gun." He opened the door and took off running, toward an open, empty field/lot, and away from the police.[44]

Jardi testified to a fact pattern which was diametrically opposite of the testimony given by Mary Ann Luna in this context. "It seemed that it was travelling at, you know, at a high rate of speed. It was kind of shocking to not see it when I made the corner."[45] Jaradi explained that he and Larson coordinated to figure out the type of vehicle. They began searching the area. Jaradi testified "[w]e spotted it [the vehicle driven by Luis Argueta] a few times while we were looking on, like, you know, parallel streets. I think at one point, I saw it in my rearview mirror or something. And yes, we ultimately did locate it in an alleyway."[46] Jaradi said that "while we were traveling west on Avenue L, then that's when Officer Larson spotted the vehicle driving east on Avenue K through the 50th Street intersection."[47]

---

[44] Attachment 2, deposition excerpts, Mary Ann Luna, 42-43, lines 1-25; 44, lines 1-19; 45, lines 2-10.
[45] Attachment 2, deposition excerpts Derrick Jaradi at 224, lines 12-22.
[46] Attachment 2, deposition excerpts Derrick Jaradi at 25, lines 11-16.
[47] The Whataburger receipt for Mary Ann Luna's meal is time stamped at 2:42:36 a.m. (Attachment __). Luis then drove to Sunny's Food Mart; he parked and went inside; he bought a

Officer Larson spotted vehicle travelling east on Avenue K through the 50th Street intersection.[48] This would have placed the vehicle one block back from the location Mary Ann Luna said the lights came on and the street they turned onto after leaving the alley. Luna explained Luis Argueta's vehicle moved through alley, and then made a right onto 52nd Street – not 51st Street as Jaradi testified. This dispute is readily resolved by other extrinsic evidence: the activation of the lights keys the activation of the dashcam.[49] The dashcam tracks the vehicle

---

cigar; came back outside; and then drove away.  Luis was shot a couple of minutes before 3:00 a.m., about sixteen (16) to eighteen (18) minutes after leaving What-a-Burger, according to the time stamp on the receipt. Yet Officer Jaradi testified that he and Larson tailed the vehicle for quite some time, seeing it "a few times" on "parallel streets."

[48] Attachment 2, deposition excerpts Derrick Jaradi at 24, lines 12-25; 25, lines 1-15.

[49] Attachment 2, deposition excerpts Derrick Jaradi at 35, line 25; 36, lines 1-3. *See also* attachment 1, City of Galveston Policy Manual excerpts, Policy 304, at 97:

> 304.1 Purpose and Scope
>
> The City of Galveston Police Department has equipped each marked patrol car with a Mobile Video Recording system (MVR). The MVR is designed to assist and compliment patrol officers in the performance of their duties. The MVR is used to record certain activities by providing a visual and/or audio record. Video recordings are intended to provide an unbiased visual/audio record of the incident and to supplement the officer's report.

Policy 304.2 requires the officer, "prior to going to service" to test the MVR system. Policy 304.3 provides, "The MVR system is designed to turn on whenever the unit's emergency lights are activated. The system remains on until turned off manually. Policy 304.3.1 is even more explicit and relevant to these underlying facts. "The activation of MVR system is required in any of the following situations:

> (a)  All filed contacts involving actual or potential criminal conduct, within video or audio range, which includes:
>> 1.  Vehicular pursuits
>> 2.  Suspicious vehicles"

…

travelling a block, stopping at one stop signs prior to the Luis Argueta pulling over near Mary Luna's house. It is there he moves out of the car with the guns at his side, toward running away with the gun to his side into a then empty lot.[50]

Jaradi admitted to not following the Department's explicit policies:

[ELLYN CLEVENGER]

Q. When would you manually activate the dashcam?

[OFFICER DERRICK JARADI]

A. **I wouldn't. I have a body cam. I didn't – I didn't really do too much with the dashcam**.[51]

Emphasis added.

> …
>
> Q. (BY MS. CLEVENGER) Okay. Well, I wouldn't expect you to have it memorized word for word. But you do know how to deactivate it manually, correct?
>
> A. Yes.

---

*Id.* at 97.

The department's policy would require the activation of the MVR system at the time the officer saw the pink hair and had his "supposed" reasonable, articulable hunch. The department requires once the system has been activated it "shall remain on and shall not be turned off until the incident has concluded." *Id.* at 303.3.1 (e) at 98.

[50] Attachments 6-10 are copies of photographs taken at the site on the night of the event, and provided by Defendants in discovery.

[51] Attachment 2, deposition excerpts Derrick Jaradi at 35, line 25; 36, lines 1-3.

Q. Okay. Do you not know how to manually activate it?

A. No, I think I do.

Q. Okay. Did you not know that there's a requirement to manually

activate it in certain circumstances?

 Mr. Giles:  Objection; form.

A. **Yeah, no, I didn't know there was a requirement**.[52]

Emphasis added.

 Jaradi adds an additional contradictory twist: he testified the light of Luis

Argueta's vehicle's lights were turned off while in the alley.[53] This position belies

his partner, who testified to the contrary.[54] Mary Ann Luna testified she didn't

remember whether the lights were on or off in the alley.

 Jaradi testified after he activated his lights the driver did not stop

immediately. He explained the driver made a right on 52nd, ran a stop sign as it

turned westward on Avenue L and stopped a block later at 5300 block of Avenue

L.[55]

---

[52] Attachment 2, deposition excerpts Derrick Jaradi at 39, lines 5-20.

[53] Attachment 2, deposition excerpts Derrick Jaradi at 28, lines 11-18; 29, lines 1-7.  Jaradi seemingly places his vehicle behind Argueta in the alley, presumably in this rendition of the facts he never turns on his lights in the alleyway, He testified the vehicle drove away after it appeared he dropped someone off (*id.* at 30, lines 16-24).

[54] Attachment 4, deposition excerpts of Matthew Larson at 22, lines 2-13 (testimony that vehicle lights were on), then later on add that as the vehicle continued to drive down the alley, the lights went off (*id.* at 22, lines 16-24).

[55] Larson supports Jaradi by contending the vehicle continued in the alley for another block, with the officers behind him, and with lights continued to be off on the street. These set of facts were

Attached under attachment 15 if a copy of the video provided from Jaradi/Larson's unit. Attached under attachment 16 is the bodycam footage. See also the affidavit of counsel attesting the video was produced in the discovery process by counsel for Defendant. Below are factual summaries of each of the possible cameras, prior to the shooting of Luis Argueta.

**Conflicting facts - patrol car dashcam video**

Dashcam video from the patrol car driven by Jaradi and Larson begins with the patrol car turning around in a street (Attachment 25, dashcam video, 0:11-0:22).  Understanding the operation of the camera is important in context of the review of the video:

Therefore, two minutes prior to the camera being activated by turning on the patrol unit lights, picks up the patrol car's location, appears to have been located on Austin Drive, at its intersection with 49th Street.[56]  When the patrol car turns around completely, the video shows a dark street lined with parked vehicles

---

postured, in the face of contradictory physical evidence and policy, and of course without neither activating the MVR. Neither Jaradi or Larson's bodycam support either of their versions of the facts.  (Attachment 4, deposition excepts of Matthew Larson at 23-25). Larsen said the vehicle was not speeding. *Id.* at 27, lines 16-17.

[56] Dashcam video shows the patrol car being located on a street, but also shows that the street dead-ends at an intersection, and across the intersecting street (almost directly across from the street the officers are traveling down, but slightly diagonally to the south), is the entrance to the alleyway where vehicle taillights become visible at 0:26.  Upon tracing back from the intersection of 52nd Street and Avenue L (1:00), the officers' location is ascertainable by reference to a City map (*see* attachment  17, map obtained from the Texas General Land Office's website (https:www.glo.texas.gov, under "GIS Maps and Data.")(last visited February 21, 2022). Absent use of some equipment resembling a periscope, seeing to the end of the alley while traveling west on Austin Drive would be difficult, if not impossible.

(Attachment 25, 0:22).  A few seconds later, the taillights of a vehicle are visible some distance away (Attachment 25, 0:25).  The taillights appear to be some distance down an alleyway across 50th Street, slightly to the left/south of the patrol car's position, and about a block and a half away (*id.*).

At 0:27, the vehicle's taillights are still visible.  There is some obstruction in the view, due to the position of the alleyway in relation to Austin Drive, and what appears to be foliage/trees at the entrance of the alleyway.  The vehicle is not moving (*id.*).

At 0:29, the taillights come into clearer view.  The vehicle does not appear to be moving (*id.*).  At 0:31, the patrol car enters 50th street without stopping at the stop sign.  At 0:32, the vehicle's lights are no longer visible in the dashcam video. The vehicle driven by Luis Argueta appears to be stopped at this point (*id.*).

Three seconds later, after the patrol vehicle enters the alleyway, the vehicle's taillights appear again (0:35).  The vehicle is moving; its brake lights come on; the vehicle then crosses 51st Street and enters the alleyway on the other side (*id.* at 0:37-0:40).

After the vehicle enters the alleyway in the 5100 block, it appears that the high beams are turned on (*id.* at 0:40).  At no time does it appear that the vehicle's lights were turned off, other than perhaps for three seconds (0:32-0:35), during

which time it is not clear that the vehicle was moving, and it is not clear that visibility is unobstructed.

Both Jaradi and Larson testified that Luis Argueta had driven across a public roadway (51st Street) without his lights on. Both testified that Luis Argueta drove the entire two blocks without his lights on. This position is not consistent with what was recorded by the dashcam.

After the vehicle enters the 5100 block of the alleyway, it passes by an overhead streetlight (*id.* at 0:44). This appears to be the first time that the vehicle is visible and possibly recognizable as any make or model (*id.* at 0:46). The fact that the vehicle is a four-door sedan, however, does not become apparent until it turns left on Avenue L (*id.* at 1:02). This is inconsistent with Officer Larson's testimony that he recognized the vehicle, while it was in the alleyway, as the four-door sedan he had seen in the convenience store parking lot.

The vehicle again brakes as it reaches the intersection of the alleyway and 52nd Street (*id.* at 0:49) and turns right onto 52nd Street (*id.* at 0:54). The patrol car's lights come on before it turns right onto 52nd Street (*id.* at 0:59), and before Luis Argueta's vehicle turned left onto Avenue L (*id.* at 1:02). As the patrol car turned right onto 52nd street, the vehicle driven by Luis Argueta can be seen at the stop sign at the intersection of 52nd and Avenue L (*id.* at 1:01).

Texas Transportation Code § 541.401(10)(A) provides that "stop" means "when required, to completely cease movement."  § 544.010(c) provides:

> (c) An operator required to stop by this section shall stop before entering the crosswalk on the near side of the intersection. In the absence of a crosswalk, the operator shall stop at a clearly marked stop line. In the absence of a stop line, the operator shall stop at the place nearest the intersecting roadway where the operator has a view of approaching traffic on the intersecting roadway.

There was a crosswalk at the intersection of 52nd and L; there was also a stop line, shortly prior to the crosswalk (*see* view of intersection, *id.* at 1:03).  After the patrol car turned completely onto 52nd Street, the vehicle driven by Luis Argueta can be seen turning left at the intersection of 52nd and L (*id* at 1:02).

The patrol car had not completely turned onto 52nd Street when Luis Argueta reached the stop line; when the vehicle is first visible in the dashcam, at an angle (*id.* at 1:00) the vehicle's brake lights are solid red, which would indicate a complete stop at the stop line.  Mary Ann Luna testified that Luis Argueta "stopped a little bit" in her deposition; however, it is not necessary that a vehicle stop for any particular length of time, pursuant to Texas Transportation Code § 544.010(c). Accordingly, even a nanosecond would be sufficient to satisfy the statutory requirement.

At the moment when the patrol car has turned completely onto 52nd Street, and the vehicle is fully visible in the dashcam video, the vehicle's brake lights are no longer activated, and the vehicle is proceeding slowly left onto Avenue L (*id.* at

1:00-1:02).  Officer Larson explained that Luis Argueta was not speeding while on Avenue L.  Mary Ann Luna testified that Luis Argueta was driving "really slow" on Avenue L).

About halfway down the block on Avenue L, between 52nd and 53rd Streets, the vehicle driven by Luis Argueta brakes (*id.* at dashcam video at 1:09).  Mary Ann Luna testified in deposition that she first noticed the patrol car's lights while she and Luis Argueta were on Avenue L.  Activation of the vehicle's brake lights on Avenue L is consistent with this testimony.

Luis Argueta continued to brake throughout the remaining half of the block (*id.* at dashcam video at 1:09-1:15).  At the time Luis Argueta's brake lights first came on, there was a driveway to his right (*id.* at 1:09); he then passed a parked SUV (*id.* at 1:10); immediately thereafter, an orange traffic barrel with reflector strips becomes visible on his right, seeming to indicate no parking (*id.* at 1:11-1:12).

Luis Argueta then reached the stop sign at the intersection of 53rd and L (*id.* at 1:13).  He stopped at the stop line at the intersection of Avenue L and 53 (*id.* at 1:14). Luis Argueta then slowly proceeded across 53rd Street (*id.* at 1:15-1:19) and braked immediately upon entering the 5300 block of Avenue L (*id.* at 1:20).  He

slowly passed three parked vehicles, pulling over at the first available unoccupied area on the right-hand/north side of Avenue L (*id.* at 1:20-1:27).[57]

The video shows Luis Argueta exiting the vehicle at 1:31 and immediately beginning to run, across the street (1:31-1:34). Luis Argueta's right arm and hand are not visible in the video as he runs (*id.*). At 1:33, Officer Larson can be seen giving chase – two seconds after Luis Argueta exited the vehicle (*id.* at 1:31-1:33). The dashcam video shows Luis Argueta running across the street, away from the patrol car (dashcam video at 1:31-1:34).

Jaradi also testified after the vehicle stopped, the driver exited abruptly and gave chase. Jaradi attempt to fashion the facts by claiming the driver – Argueta – ran diagonally in his direction.[58]

Jaradi said he thought Luis was concealing something. "He was running with his left hand was swinging. But his right hand stayed down at his right side, almost as if he was holding something." Jaradi testified he yelled at Luis to take his hand out of his pocket. "As I was yelling that, his hand – which I don't know if it was in his pocket or not. But his hand became – his right hand became visible. And

---

[57] None of the dashcam video is consistent with Officer Jaradi's testimony that Luis Argueta had been engaged in a felony vehicular escape attempt prior to stopping.

[58] Attachment 4, deposition excerpts of Mathew Larson (Larson testified "after Luis got out of the vehicle and started running southbound. He also explained that both he and Jaradi gave chase. Larson said he was ten sets behind them and saw Luis running into a vacant lot. "I heard Officer Jaradi yelling at him, then two gunshots." *Id.* at 28, line 25; 29, lines 104; 30, lines 11-20; 31, lines 2-19.

he made an upward motion. And he had full – a handgun with an extra-large magazine."[59]

By Jaradi's own testimony, Jaradi told Luis to move his hand in an upward motion (take your hand out of your pocket). Luis had, according to Jaradi, complied with that instruction.

Again, at one point in his testimony Jaradi says he was diagonal to Luis. He also explained he could see Luis from Luis' left side. He then postures he was facing toward Luis when Luis moved, and when Luis raised his hand per Jaradi's demand, Jaradi shot Luis Argueta twice (in the back) out of fear for his and Officer Larson's life.[60]

The Galveston Police Department foot pursuit policy is located at Section 216 of the Galveston Police Department Policy Manual. "Officers may be justified in initiating a foot pursuit of any individual the officer reasonably believes is about to engage in, is engaging in or has engaged in criminal activity. The decision to initiate or continue a foot pursuit, however, be continuously reevaluated in light of the circumstances presented at the time. Mere flight of a person who is not

---

[59] Attachment 2, deposition excerpts Derrick Jaradi at 43, lines 12-25; 43, 25; 44, lines 1-1-23. A later forensic examination of the gun revealed: a Glock 21 45 caliber pistol retrieved at the scene bearing a serial number VXF347. The pistol's slide was in a closed position. The pistol contained an extended magazine with a thirteen-round capacity. The Glock 21 45 caliber, serial number VXFC347, did not have any ammunition/rounds in the chamber of the pistol. See report at attachment 16.

[60] Attachment 2, deposition excerpts Derrick Jaradi at 43, lines 23-25; 43, lines 1-4 (diagonally); 43, lines 21-23 ("I could see his left-hand side"); 46-40 (facing towards him).

suspected of criminal activity shall not serve as the sole justification for engaging in an extended foot pursuit without the development of reasonable suspicion regarding the individual's involvement in criminal activity."[61]

Willful noncompliance with MVR policy permitted Officer Jaradi to posture his position relative to Luis Argueta, when Argueta fled into the open lot from the street – diagonally from him[62] – facing him – viewing him from the side – to posture the shooting was justified. Somewhat inconsistently, Jaradi did later admit the gun was never pointed towards him.[63]  Jaradi also allowed that the way Luis Argueta had been holding the gun, when moving his hand, was not the way he would hold a gun to shoot it; but that the movement of Luis Argueta's hand/arm

---

[61] Attachment 1, excerpts from Policy Manual for City of Galveston Police Department, see Policy 216 at 89 [Decision to Pursue]. Section 216.3 provides guidelines for foot pursuit, "unless the officer reasonably believes that exigent circumstances exist (e.g., serious threat to the safety of personnel or members of the public). Officers should consider threat to the safety of personnel or members of the public; officers should consider alternatives to engaging in or continuing a foot pursuit under the following conditions:

> (n) The identity of the suspect is established, or other information exists that will allow the suspect's apprehension at a later time, and if necessary, and it reasonably appears that there is no immediate threat to department personnel or the public if the suspect is not immediately apprehended,

[62] Oxford Learner's Dictionary
https://www.oxfordlearnersdictionaries.com/us/definition/english/diagonally (last visited February 20, 2021):

Diagonally, "at an angle; in a way that joins two opposite sides of something at an angle

- *Walk diagonally across the field to the far corner and then turn left.*

[63] Attachment 2, deposition excerpts Derrick Jaradi at 54, lines 8-20.

had been consistent with running.[64]  In his deposition, Jaradi continued with his

rendition of the facts, to-wit:

[ELLYN CLEVENGER]

Q. If you're on a neighborhood street and there's a vacant lot, he ran into the

vacant lot, correct?

[OFFICER DERRICK JARADI]

A. …that's where he fell.

Q. So he wasn't on the vacant lot when you shot him?

A. I don't remember exactly where he was standing when the shots were

fired.  I want to say it was kind of towards the edge of the street, but I'm not

100 percent sure. It happened pretty fast.

If he was 20 feet inside the lot, are you testifying that you shot him and he

flew 20 feet.

A. No. He ran and fell there.

Q. Okay. So he ran twenty feet after you shot him?

A. I don't know how many feet he ran.[65]

Jaradi also testified "I have no idea where I shot him."[66]  Attached under

---

[64] Attachment 2, deposition excerpts Derrick Jaradi at 53, lines 16-25.
[65] Attachment 2, deposition excerpts Derrick Jaradi, 46-49. When further clarification was sought, Jaradi disagreed with the position that Luis Argueta was running away from him. *Id.* at 50, lines 3-7.
[66] Attachment 2, deposition excerpts Derrick Jaradi at 54, line 3.

attachment 25 is the bodycam video for Officer Jaradi. What is particularly disturbing about this video is the fact that the video was not activated during the entire interaction with Argueta, beginning at Sunny's Food Mart.[67]  Officer Jaradi activated his camera after he shot Argueta.[68]

---

[67] The Department's policy for bodycam videos which existed in 2018 represents a policy and practice which worked deprive decedent of his constitutional rights (attachment 1, excerpts from Galveston Police Department Policy 1004). A new policy was not instated until 2020 (Policy 423) (attachment 22, Policy 423). Therefore, at the time of the event surrounding the death of Mr. Argueta, there was nothing in the then-existing policy from the City of Galveston police officers preventing the silencing of others, turning off the sound, or secreting cameras in their car – this latter occurred with respect to Officer Jaradi's body camera, which was placed into an unoccupied vehicle.  Jaradi was removed from the scene by Sergeant Xavier Hancock, and was instructed to be silent by both Sergeant Hancock and Sergeant Caldwell.  Sergeant Hancock instructed that the body cameras be turned off.  It is not clear who places the body camera in the vehicle.

However, much later, Sergeant Caldwell retrieves Jaradi's body camera from the vehicle and turns it off (see attachment 23 (image of Caldwell's hands when attempting to put his gloves on, showing distinctive pattern on metal bracelet); taken from Attachment 31 at 1:18.  *See* attachment 24, picture; showing Caldwell's hand attending to Argueta; same distinctly patterned bracelet is visible on Sergeant Caldwell's wrist (attachment 26, Jaradi's bodycam, Part 2 at 13:37).

The Policy which was in existence at the time (Policy 1004, see under attachment 1, Galveston Police Department's Policy Manual contains eight different sections but does not have any information or instructions to when to activate the cameras and when to cease recordings. Because of the City of Galveston's then existing policy, the Department was able to silence information, tell others to be quiet, turn off their cameras at selected times or by taking the camera off the person of officer(s), not record for the majority of time Argueta is followed from the store, until his death. As also seen from the explicit testimony, this official policy supported the complained about practice.

[68] Jaradi's bodycam footage is attachment 26. In answers to Plaintiff's Second of Interrogatories, Defendants provided information surrounding the workings of the body cameras (see at attachment 38).

The retroactive video/pre-event recording, which is picked up without audio for a period of time before the body camera is activated, shows Argueta running south, across Avenue L, into the vacant lot.  Luis Argueta ran in front of the patrol car, toward the vacant lot.

Before Argueta enters the vacant lot, Jaradi raises his weapon, aiming it at Luis Argueta (*id*. at 1:55).[69]  It should be noted that Jaradi exited the vehicle two (2) seconds prior, at 1:53.  There is no audio.

When Jaradi raises his gun and takes aim at Luis Argueta, Luis Argueta's gun is not visible (*see* next frame 1:56).  At 1:57, Jaradi is not running, and is taking aim at his target. Still there is no audio.

Audio does not pick up until 1:59, after the shots were fired. Jaradi is heard saying, "hands up, hand up, drop it, drop it drop it! (*id.* at 1:59 -2:05). At the time Jaradi says, drop it, Argueta is laying on the ground, with no weapon in his hands.

---

[69] At the time that Jaradi raised his gun and aimed at Luis Argueta, Jaradi testified that he "didn't have any knowledge that he [Luis] was holding a gun" and "didn't, at that moment before I saw the gun, feel my life was threatened."  Attachment 2, deposition excerpts of Derrick Jaradi at 54, lines 13-20.



[Source: Image excerpted from bodycamvideo, see left hand up, see right hand devoid of any object/gun]

Argueta says, "it's dropped, it's dropped." *Id.* 2:08. At 2:13, Argueta says, "Why did y'all shoot me?" At 2:14, Jaradi is on the phone with dispatch when he yells "drop the gun now man!  Drop the gun now!"[70] Argueta is clearly visible; both of Argueta's hands are visible; Argueta is not moving; is not holding a weapon; and is not reaching for a weapon (*id.*).  Argueta says again, "it's dropped!"  At 2:16, Jaradi shouts "don't reach for it!" Again, Argueta has not

---

[70] While on the phone with dispatch initially, Jaradi reports that the "suspect" had been "shot in the back."  Again, Jaradi testified in deposition that he had "no idea" where he had shot Argueta (*supra*).

moved; both of Argueta's hands are clearly visible; Argueta is not reaching for anything (*id.*).  Argueta protests again "I'm not!"

Argueta is clearly visible; Argueta's hands are visible; Argueta is not moving; is not holding a weapon; and is not reaching for a weapon (*id.*).  Jaradi continues to shout, "don't reach for it" and Argueta continues to not move, again protesting "I'm not" (2:17-2:19).  Larson then instructs Argueta to roll over on his stomach, and Argueta immediately complies (2:20), moaning in an incredulous tone "y'all shot me!" *Id.* at 2:25.

Larson's bodycam video is attached herein as attachment 27. Larson's video suffers from the same defect, it is a silent movie until 1:56. Larson opens the door at 1:56 but does not get out of the car until 1:57. He runs around the front of the car and audio comes in at 1.59, still in violation of policy, in that camera remained not activated until this moment. At 2:00, two shot in rapid succession are fired, Jardi says "damn it at 2:01."  Argueta screams at 2:02, "ohhhhh!" The light is devoid and you here, and one hears Jaradi's voice, screaming "hands up, drop, it" (2:03). Something unique happens here on Larson's recording, Larson's voice is heard for the first time, a voice not heard in Jaradi's tape's tape (2:07). Argueta is moaning with his hands up and saying, "it's dropped, it's dropped." (2:11-2:12). Jaradi gets on phone with dispatch and tells dispatch shots have been fired (2:13). Argueta says, "what the fuck,", this is in response to Jaradi's statement while on the phone

with dispatch telling him to drop it. Argueta is lying on his back; no wound is visible in that he was shot in the back.

The same phenomenon occurs, officer Larson says, "don't reach for it" (2:22). At 2:23 Larson tells Argueta to roll over onto this stomach (2:23). Argueta complies, hands up, slowly rolling. He begins to roll 2:24 – 2:26). Larson's commands – like Jaradi's commands – create a cognitive disconnect while watching the video.  If one only listened to the audio without watching the video, one could readily assume Luis Argueta's non-compliance; failure to drop his weapon; and continuing to reach for his weapon.

Shortly after the audio recording begins, Luis Argueta can be heard screaming in pain saying plaintively, y'all shot me" (2:31). "Please get a[n] ambulance" were Argueta's next words (2:34).  Argueta is in the process of rolling and one can see patches of blood on the ground and the injury to his back (2:27-2:35).

Jaradi screams contradictory commands at Luis Argueta – "hands up bro!" then "hands out!" (2:42-2:43). Argueta says, "You shot me" (2:44).  Jaradi responds, "Yeah, you were holding a gun … oh shit!" (246 -2476).  Notably, Jaradi doesn't say anything about "I told you to drop it."

Larson is heard next, giving the address to dispatch, "5300 Avenue L" (2:48). Larsen then leaves from the middle of the lot to the street and approaches the vehicle, still containing Mary Ann Luna.

Larson commands Luna "go on, get out of the car" (2:49-3:09). Mary Luna gets out of the car and starts to sit on the curb (3:18-3:19).  Larsen then commands, "step around the front of the car (3:22.  Luna gets up to stand in the vehicle she just got out off and Larson then commands, "in front of my car." (3:25.  As Mary Ann walks toward the patrol car, Larson says (3:35) "…[inaudible] …we got one detained."  Mary Ann sets her cell phone on the hood of the car, not in response to any commands from Larson, who says nothing to her as he places her in handcuffs (3:43).

Sirens can be heard in the background, then Larson is heard saying, "come on to the back of the car, you don't have anything on you" (3:57). Luna says "no, just my phone right there" (3:58). Larson then says, "Oh course, we will get you your phone" (4:00).[71]  Larson's places Mary Ann in the back of his car (4:11).[72]

---

[71] Mary Ann never got her phone (appearing on video to be an iphone) back, despite asking the Galveston Police Department to return it to her (Attachment 3, excerpts of deposition testimony of Mary Ann Luna, at 80).

[72] Larson cannot be heard on the video yelling at Mary Ann to show him her hands; never tells her that she is not being arrested; and never performs a pat-down search on Mary Ann. Larson testified in deposition "I believe I started yelling at her […] to show me her hands and then exit the vehicle […] I specifically remember telling her she was not arrest [*sic*], that she was just being detained at that time […] I believe I did a quick pat-down to look for any weapons […] [w]hen she was in front of her vehicle and she came out of the vehicle is when I handcuffed her;

Larsen then turns and walks back toward Argueta – roughly 20 feet into the lot and Argueta is heard, "I feel like I'm dying" (from 4:11 to 4:29). This short distance belies a chase, particularly in light of the previous reference showing the time Jaradi raises his weapon and fires (Jaradi's bodycam summary above).  Luis Argueta is still prone, lying on his stomach (4:29).

There are now multiple officers on the scene. Supervising officer Joel Caldwell is standing the closest to Argueta, saying, "put your hands out man. Put your hands out like and airplane, dude" (4:21-4:23). Larson says, "don't get up, we got EMS coming (4:25). This is when the statement "I feel like I'm dying is said.

Caldwell said, "let me get my gloves on" (4:28), then broadcasts, "tell everyone to slow down, everybody slow down" (4:38-4:00). The sound of sirens – previously heard in the distance – are silenced.

Argueta says, "Please, I feel like I'm dying" (4:47). Caldwell now has his gloves on, and starts to pat down Argueta. Caldwell asked, "do you have any more guns on you." Argueta responds, "no way" (4:48-5:01). Caldwell then says, "knives or anything like that". Argueta replies, "no" (5:01-5:03). Larson raises a

---

and that's when I told her that she was not under arrest, that she was just being detained."
Attachment 4, deposition excerpts of Matthew Larson at 37, 38.
GPD Policy Manual Section 204.3.1 provides: "Situations may arise where it may be reasonable to restrain an individual who may, after brief investigation, be released without arrest.  Unless arrested, the use of restraints on detainees should continue only for as long as is reasonably necessary to assure the safety of officers and others."

flashlight, pointing at Argueta, "Is there anything else in the car, we need to know about." Luis says "no" (5:03-5:08).

Caldwell asks Larson, "who was that other officer over there?" gesturing toward Larson and Jaradi's patrol vehicle. Caldwell responds, "that was me, I was detaining the other person in the car (5:08-5:13).

At 5:17, the wound to Luis Argueta's back is clearly seen. Argueta's words are unintelligible, it seems probably to be him saying, "can you help me" (5:13-5:15). Caldwell is placing Argueta in handcuffs (5:18).[73]

Other officers are standing in the background. All continue to completely ignore Luis Argueta's pleas for help, having conversations over his head, as though he is not even lying there, much less lying there bleeding to death.

An officer is heard asking Larson and Jaradi whether they are "good," (5:15-5:24). Both reply affirmatively, "I'm good." Larson instructs an officer to "search [Argueta's] car, we have a female detained in our car." (5:24-5:29).

Caldwell asks Argueta "how old are you man?" Argueta responds, "I'm eighteen." Caldwell then asked for Argueta's name and Argueta responds, "Luis" (5:40 – 5:46). Caldwell is then visible on camera, making a hand signal to the officers (5:46-5:50).

---

[73] Section 204.4 of the Galveston Police Department Policy Manual provides that handcuffs "may only be used to restrain a person's hands to ensure officer safety [….] officers should not conclude that in order to avoid risk every person should be handcuffed[.]"

Jaradi then approaches Larson and asks, "You all right man?" (5:50 -5:52). Larson responds, "Dude I didn't even see that gun (5:52-5:54). Jaradi interrupts Larson's sentence, responding, "I saw it man, I saw it" followed by "I told him to drop it, he didn't drop it" (5:54-5:57). When this interaction takes place, Larson can be heard saying "no".

There are perhaps 15 officers milling about in the vicinity, 5-7 of them standing around in the vacant lot looking at Argueta as he lies in the center of the circle, bloody and moaning, with handcuffs on (5:58). Clearly, everyone has taken with Caldwell's previous command – "everybody slow down" – to heart. The sirens remain silent.

Luis Argueta says, "Oh please" (5:58-6:13). Larson is heard saying, "I didn't, uh, I didn't actually…." An officer named Javier Hancock silences Jaradi by saying "come with me." Both officers stop commenting (6:13-6:18). Caldwell raises his hand and says sharply, "don't say anything" (6:18-6:19).

Hancock moves off camera with Jaradi, telling Jaradi "stop talking, stop talking, stop talking." Caldwell asks for crime scene tape (6:19-6:23). The officers are seen slow-walking the rendering of aid (6:23-6:45). Caldwell then walks over to examine the gun lying on the ground, shining his flashlight on the gun and says "Damn!  Motherfucker!  Glock 2145 (6:45-6:48).  Larson says, "with an extended magazine (6:48-6:53).

During this time period, Larson asks Caldwell whether there is anything that he needs to do, since he was on the scene at the time of the incident.  It appears that Larson is informing Caldwell that he was the non-shooting officer, and that Caldwell was not previously aware of this fact.  Caldwell tells him no.[74]

Not until the 7:04 point does Caldwell make a comment about getting Argueta medical attention, saying generally "someone go get a first aid kit" one of the officers to move in and start rendering aid (7:04-7:12).  The officer puts on gloves, pulls some gauze out of a package, and presses it down on Argueta's back (entry wounds).  Larson is then seen raising his hand and pointing an object at Argueta – it is not known at this time what the object was (7:08). The EMS arrives on the scene at 8:34, Caldwell is heard saying, "over here guys, over here." EMS is seen at 8:54. The handcuff are removed at 9:15-9:19. EMS personnel is heard saying, "scoop him" and Argueta is removed from the scene" (9:19-10:29). An unidentified officer asked, "did he ever identify what his name was." Another voice is heard saying "no." Caldwell said, "he did, I caught it on video, but I didn't catch it here." At 12:05, Caldwell instructs Larson, "since you were riding two-

---

[74] GPD policy manual 210.2.1 provides in part "Upon arrival at the scene of an officer-involved shooting, the first uninvolved supervisor should:
    (a)  Take all reasonable steps to obtain emergency medical attention for inured individuals.
    (b)  Attempt to obtain a brief overview of the situation from any non-shooter officer(s).

man, you can go ahead and kill your camera" (12:00 – 12:05). Filming terminates at this point.

### The Medical Examiner's Autopsy

At 3:42 a.m. on June 25, 2018, Luis Fernando Argueta died, at the University of Texas Medical Branch, Galveston, as the result of the gunshot wounds.[75] The medical examination was conducted by Erin A. Barnhart, M.D., Chief Medical Examiner of Galveston County, Texas.[76] revealed Luis Argueta to be a Hispanic male; 66 inches tall; 176 pounds; and whose appearance was consistent with his reported age of 18.[77] The medical examination revealed Jaradi's position of Luis Argueta was not exactly accurate.

The first wound was from the rear, below the right shoulder.

> An entrance-type gunshot wound is on the right back, 12 centimeters below the top right shoulder and 4.5 centimeters right of the midline. It is a 1-centimeter, round defect with a 0.1-centimeter rim of abrasion from, the 6 – 10 o'clock position. **The projectile entered the right plural cavity through the posterior aspects of the right 3rd – 5th ribs and penetrated and perforated the upper lobe of the right lung. An exit-type defect is on the right upper chest, 8 centimeters**

---

[75] Attachment 17, Certified Copy of Autopsy of Luis Argueta.
[76] *Id.,* 1.
[77] *Id.*

**below the top of the right shoulder and 8 centimeters right of the midline.** It is .08 centimeters, irregular defect associated with underlying fracture of the right clavicle. Multiple irregular projectile fragments are recovered from the right chest.[78]

Associated with the wound are soft tissue hemorrhage, rib, and clavicle fractures, right hemothorax and lacerations of the upper lobe of the right lung.

Emphasis added.

The second wound also reflected Luis Argueta was shot in the back:

An entrance-type gunshot wound is in the left axilla, 12 centimeters below the top of the left shoulder and 2 centimeters anterior to the left mid-axillary line. It is a 0.8-centimeter, round defect. The projectile passed through the soft tissues of the axilla and anterior chest, and exited the left upper chest, 10 centimeters below the top of left shoulder and 15 centimeters left of the midline, through a 6 x 4.5-centimeter, irregular deflect and three irregular defects ranging from 0.4 - 0.8 centimeters in maximal dimension.

Associated with the wound is soft tissue hemorrhage. No significant vascular injury is present. **The path of the projectile, with the body**

---

[78] *Id.,* 2-3.

**in anatomic[79] position, is left-to-right, back-to--front, and slightly**



**upward.**[80]

Emphasis added.  The diagram above illustrates "anatomical position."

The Galveston County Medical Examiner's Office ruled Luis Fernando

Argueta's death to be a homicide, writing, "The above decedent was reportedly

---

[79] Anatomical position is described as, "A person standing upright, facing forward. · Arms straight and hands held by the hips, palms facing forward. · Feet parallel and toes pointing forward." https://teachmeanatomy.info/the-basics/anatomical-terminology/anatomical-position/, visited on February 20, 2022.
*Id.* at https://teachmeanatomy.info/the-basics/anatomical-terminology/anatomical-position/, site visited om February 20, 2022.
[80] *Id.* at 3.

shot by a law enforcement officer. At autopsy, there were two gunshot wounds

involving findings and current investigational information, this 18-year-old male

died as a result of gunshot wounds. The manner of death is homicide.[81]

Homicide under the Texas Penal Code Chapter 19 is defined as, "A person

commits criminal homicide if he intentionally, knowingly, recklessly, or with

criminal negligence causes the death of an individual." Galveston Police Reports

state that a firearm was taken from the scene.

Officer J. Pitts authored a Supplemental Report in which he identified a

black Glock handgun with an extended magazine, lying on the ground a few feet

from where Luis Argueta was lying[82]

The Supplemental Report by Officer C. Thompson provides that Thompson

arrived at the scene at approximately 3:04 a.m.  Officer Thompson exited his

vehicle with a First Aid Kit and applied a dressing to Argueta's wounds.  He

applied pressure for approximately one minute prior to the arrival of EMS

personnel.[83]

---

[81] *Id.*, 4.
[82] Document produced by the City of Galveston pursuant to an open records request; see at attachment 18.  Interestingly, the gun was left lying in the vacant lot, unattended and unobserved, for an indeterminate period of time; Lieutenant Ochoa notices this shortly after she arrived on scene, instructing several officers that someone needed to go keep an eye on the gun (Christian McCormack body camera recording, Attachment 28 at 15:06).
[83] Document produced by the City of Galveston pursuant to an open records request; see at attachment 19.

In Sergeant L. Caldwell's Supplemental Report, Caldwell identified himself as the first backup at the scene. Caldwell stated he arrived at 3:00 a.m. Caldwell identified Luis Argueta lying on the ground, bleeding, in a vacant lot on the south side of Avenue L. Defendant Jaradi was standing over Luis Argueta with his gun drawn, giving Argueta verbal commands. Caldwell's Supplemental Report provided that Defendant Jaradi told Caldwell that Argueta had not yet been handcuffed; Caldwell then placed handcuffs on Argueta.[84]

During this period, Caldwell repeatedly engaged in a practice of secreting information by instructing the officers under him to turn off their body camera(s). Sergeant Joel Caldwell was the supervising officer, second to the night watch commander, on the date of the incident (*see* attachment 21, deposition excerpts of Renaye Ochoa at 16, 22-25; 17, lines 1-14).  Sergeant Caldwell was also the first responding officer at the scene (attachment 20, deposition excerpts of Joel Caldwell at 10, lines 1-22).

Sergeant Caldwell tells Officer Larson to turn his body camera off – this is seen on Officer Charles Thompson's body camera video recording;[85] Caldwell instructs Larson "you can go ahead and kill your camera" (Charles Thompson

---

[84] Document produced by the City of Galveston pursuant to an open records request; see at attachment 19. See also attachment 20, deposition excerpts for Joel Caldwell, 10, lines 1-22; 11 lines 4-25; 12, lines 1-25.
[85] Attachment 29, bodycam footage for Officer Charles Thompson.

body camera, attachment 29, (8:30).  Sergeant Caldwell then says "hey Thompson you can kill your camera also[;]" Officer Thompson responds "yes Sergeant" (*id.* at 8:32).  Sergeant Caldwell also instructs Officer James Ewing: "actually Ewing you can do the same when you get the crime scene tape up (James Ewing, body camera recording, Attachment 30 at 7:34).

These instructions to terminate the body camera - given by Sergeant Caldwell – was contrary to policy. He investigation was an active crime scene.  In fact, as the supervising officer/second-in-command on the scene, Sergeant Caldwell himself turns off his body camera at 7:55 (body camera video from Joel Caldwell, Attachment 31).  Interestingly, despite the stated fact that body camera footage picks up without audio for two minutes pre-activation, Sergeant Caldwell's body camera footage only picks up 51 seconds prior to activation (*id.* at 0:50-0:51).

Other officers on scene also had adopted the policy as implemented.  The crime scene log, detailing individuals in and out of the crime scene, was constructed after the fact (Officer Justin Owens, body camera recording, Attachment 32, 8:10 - 14:54).  Owens' body camera footage shows him discussing the various people who had been in and out of the crime scene, with Officers Duanez and Pitts, attempting to reconstruct the activity (*id.*).  At 14:54, another officer approaches from behind the crime scene tape, points at Owens' chest, in the

direction of his body camera, and says "are you?"  Owens immediately turns off his body camera (*id.*).

Officer Jacob Pitts, an officer on scene, discusses the weapon with three other officers, including Larson.  Pitts says, "so I just took a report about a gun matching that description that's why – it was yesterday – I took a report about some people jumping out pointing guns at people and they described that right there um, so I'm wondering, that's why I was wondering what his name was" (body camera footage of Jacob Pitts, Attachment 33 at 15:10).  Larson gestures at Pitts to turn his camera off (*id.* at 15:23).  This interaction can also be seen on Officer Christian McCormack's body camera recording (Christian McCormack body camera recording, Attachment 28 at 14:43); another officer can be heard telling Pitts he needs to turn his body camera off.

Earlier on Pitts' body camera recording, Pitts has a conversation with another officer (Jacob Pitts body camera recording, Attachment 32 at 12:10).  There is an audible tapping noise on Pitts' recording; the other officer looks down at Pitts' body camera (*id.*).  Pitts and the other officer appear to exchange some non-verbal communication, in acknowledgment of the fact that they are being recorded.

Sergeant Xavier Hancock also gave instructions to turn off body cameras (body camera recording, Xavier Hancock, Attachment 34).  Hancock's video, as he

approaches the scene, shows five (5) officers standing around Luis Argueta, including Jaradi and Larson (*id.* at 3:59).  None of them is rendering aid to Argueta, who is lying on the ground in handcuffs, moaning in pain and pleading for help (*id.* at 4:03-4:25).

Hancock approaches Jaradi and says "what … the actual" (*id.* at 4:11). Jaradi asks about representation (4:15-4:22).  Argueta can be heard saying "oh, please" in the background (*id.*).  Hancock tells Jaradi "come with me" (*id.* at 4:22). Jaradi says "I didn't, uh, I didn't actually" – Hancock interrupts and says loudly "stop talking! Stop talking!  Stop talking!" *Id.* at 4:23-4:28. Caldwell can also be heard telling Jaradi "don't say anything." *Id.*

Hancock walks Jaradi off the vacant lot, into the street (*id.* at 4:30-4:58). Hancock stops Officer Ronnie Driver; instructs Driver to take Jaradi, sit in the front seat of Driver's car with Jaradi; and "turn the camera off, in the car, turn your camera off" (*id.* at 4:58-5:02).  Hancock later tells Jaradi "don't say s**t to nobody.  Including me." *Id.* at 7:55.

Officer Kameron Mooneyham was dispatched from the crime scene to go purchase a phone charger for Jaradi (*see* attachment 3*5, b*odycam recording of Kameron Mooneyham, at 10:15 "Jaradi needs an android charger.  We have to buy one.  His phone's on two percent and TMPA's trying to call him.").  Mooneyham travels to the RaceTrac gas station on Broadway Avenue, purchasing a phone

charger and bottles of water, then returns to the scene (*id.* at 11:15-18:50). Mooneyham brings the charger and water to the vehicle where Jaradi is sitting; its headlights are on, such that neither the vehicles nor their occupants are visible (*id.* at 20:16).  As Mooneyham approaches, someone shouts "STOP! STOP! Turn your camera off!" *Id.*

It appears that Sergeant Caldwell also violated policy by his delay in administering medical attention to Luis Argueta (Argueta begged for medical attention, first asking why the officer shot him, asking to be taken to the hospital, then saying he was dying, and begging for help).[86]

Sergeant Xavier Hancock's body camera footage shows EMS personnel walking up 53rd Street toward Avenue L, not appearing to be in any hurry (Attachment 34 at 6:36).  Hancock directs them, saying "over in the empty lot. He's conscious enough to complain, so there's that" (*id.*).  He then says "morning, by the way" (6:40); one of the EMS workers responds "morning" (6:41); the emergency medical personnel then continue to walk – not run – in the direction of the vacant lot (*id.*).  Hancock calls the captain, informing "Jaradi was involved in a

---

[86] Caldwell denied any such violations. Under questioning Caldwell was clear, that he followed policy and the cameras remained on until the event was over (attachment 20, deposition excerpts of Joel Caldwell, 16, lines 1-8. Caldwell also explained that medical aid is rendered in a reasonable amount of time. When asked what constitutes a reasonable amount of time, Caldwell used tautological language to the explain the policy, "I would think a reasonable amount of time would be as soon as practical." *Id.* at 17, 10-12. It appears the explanation did not matter in light of Caldwell instructions to his subordinates to violate policy.

shooting.  Jaradi is fine.  Suspect is conscious enough to complain" (*id.* at 8:30).

Hancock then makes another phone call, "who have you called?  I just called the

captain.  I didn't know if you had so I told him Jaradi shot somebody that there

was a gun, and that the victim was conscious enough to complain so he's coming

out.  That's the only other phone call I made beside calling you.  What information

do you need or want?" *Id.* at 9:28.

Officers Jeffrey Michael; Christopher Pompa; and William Hardman are

dispatched to the hospital after Argueta is transported there.  While standing in the

hallway, one of the officers asks, "he a Hispanic dude?" (Jeffrey Michael bodycam

recording, Attachment 36, 4:45).  Hardman and Pompa both say that Argueta

looked familiar (*id*).

Later in the recording, officers are discussing whether to notify Hancock that

Argueta has died, when suddenly Michael says "sh, sh, sh" and turns off his body

camera (*id.* at 21:07).  When Michael reactivates his body camera, the two minutes

of pre-activation recording (without audio) show the officers are speaking with a

Galveston County Sheriff's Department investigator. *Id.*

Later in this second video, Michael is having a conversation with someone,

says "hey you got a license plate on it?" and covers up his bodycam so sight is

obscured, and sound is muffled (*id.* at 19:44-19:57).  Subsequently, two

investigators from the Sheriff's Department can be heard speaking; the female

investigator says, "who's going to call his [inaudible – may be "parents"]?" *Id.* at

27:22. The male investigator says, "she's out there now" (*id.*).  Michael

immediately shuts off his body camera. Sergeant Joel Caldwell admitted he knew

the policy of the department, "We turn our body cameras off when the event is

over" (attachment 20, deposition excerpts of Joel Caldwell at 16, lines 1-8). He

explained that he turned the cameras off when Mr. Argueta was taken to the

hospital. Id. When asked whether he ever covered his camera with his hand, he

denied. Id.

Lt. Carmen Renaye Ochoa came to the scene after he heard about the

incident over the radio (attachment 21, deposition excerpts of Lt. Ochoa at 9, lines

18-23). Ochoa explained her role at the scene was to ensure everything is done

correctly, check on anyone who needs assistance, make sure those who needed to

be contacted are contacted (District Attorney, administrators (*id.* at 10, lines 6-19).

"When I arrived on scene, it was a chaotic scene. So I assisted with helping to put

the crime scene tape up for the perimeters." While at the scene Lt. Ochoa spoke

with a witness who was possibly and eyewitness. She described him as an elderly

African American who informed her, he was sitting in his car listening to his IPad.

She also explained that he was cooperative and would remain. Ochoa informed on

the perimeter that the gentleman was possibly an eyewitness and the Sheriff's

Department would need to talk with him. The witness was never interviewed, was

permitted to leave and/or the information was never conveyed to the Sheriff's

Department investigators. Ochoa explained that since the scene involved an officer

involved shooting the Sheriff's Department would act as the investigators on the

case (*id.* at 11, lines 8-25; 12, lines 20).  Ochoa described Sergeant Joel Caldwell

as the supervising sergeant on the scene (*id.* at 16, lines 22-25; 17, lines 1-5).

Some of the facts related to custom, policy and practice and procedures are

contained under the section related to holding the City of Galveston in the lawsuit.

Otherwise, Plaintiff submits that it is on this Statement of Facts that Plaintiffs

contend the Defendants' Motion for Summary Judgment should be denied in all

respects.

    II.    Summary Judgment should be denied with regard to Defendant
            Jaradi.

A. Supreme Court & Fifth Circuit Precedent.

Derrick Jaradi's request for summary judgment is subject to the standard

long established in the Fifth Circuit, that is, under the doctrine of qualified

immunity, "governmental officials performing discretionary functions generally

are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus,

to establish whether the Defendant officer is entitled to qualified immunity at the

summary judgment stage, we must engage in a two-pronged inquiry, The first asks

whether the facts, taken in the light most favorable to the party asserting the injury show the officer's conducted violated a federal right." *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). "The second prong of the qualified-immunity asks whether … the right in question was "clearly established at the time of the violation." *Id.* at 656, *citing Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

For purposes of liability under 42 U.S.C. § 1983, excessive force claims arising from an arrest or investigatory stop invoke the protection provided by the Fourth Amendment of the United States Constitution against "unreasonable seizure." Fourth Amendment jurisprudence, however, has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, determining whether the force used to effect a particular seizure is "reasonable" for purposes of the Fourth Amendment requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake. Regarding that analysis, the Supreme Court, in *Graham,* 490 U.S. at 396, 109 S.Ct. 1865, provided the following guidance:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), its proper application

requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

In the case at bar, Plaintiff brought suit against Officer Jaradi and the City of Galveston for the excessive force used, in this case deadly force, against Luis Argueta on June 25, 2018. The force led to Argueta's death (see Plaintiff's Original Complaint (doc. 1)), necessitating Plaintiffs bringing suit for decedent's wrongful death. The decedent's mother, father and sisters are parties to the claim. The decedent's siblings brought a survival action for their own damages wrought as a result of Luis Argueta's death, and Jelldy Argueta brought a claim on behalf of the decedent's estate.

Plaintiffs contend in context of the underlying facts, and even if reviewing the facts through the eyes of the officers as they tracked Argueta, the force used was unwarranted. The Fifth Circuit recently in *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021, 171-172 explained, "Importantly, '[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' *Id.* Thus, '`[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment.' *Id.* (quoting *Johnson v.*

*Glick,* 481 F.2d 1028, 1033 (2nd Cir. 1973)). Instead, 'the calculus of

reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain,

and rapidly evolving —about the amount of force that is necessary in a particular

situation.' *Id.* at 396-97, 109 S. Ct. 1865. Although all disputed facts are construed

in favor of the non-movant in the summary judgment context, evaluating the

reasonableness of an officer's use of force requires consideration of how a

reasonable officer would have perceived those facts. *Griggs v. Brewer,* 841 F.3d

308, 313-14 (5th Cir. 2016)."

In this case, a car parked at a convenience store does not necessary

constitute a crime or give rise to an inference that criminal activity is underway.

The picture of Argueta leaving Sunny Food Mart, passing by a woman entering the

store (attachment 39 (picture produced by Galveston County Sheriff's Department

in investigation, and produced by Defendants in discovery disclosures), is innocent

behavior.

Obviously officers are not required to be perfect, but the colored picture

does not reflect a woman with pink hair, nor does it reflect Plaintiff and the woman

having any interaction, other than passing by each other at the door. Viewing the

facts from the officer's perspective – the officer is permitted to use his/her training

when patrolling dangerous streets. The officer(s)' reference to a person with pink

hair - viewed from the highway (Broadway is designated as Highway 87) - may give rise to an officer's reasonable suspicion - but in a summary judgment context, the survivor – Mary Ann Luna - explained Argueta only talked to the clerk and no one outside the store.

Suspecting a drug transaction may be reasonable to an officer – so be it, but mere presence at a given location does not necessarily mean a crime is being committed.  One cannot be culpable for evading, eluding, or escaping when there is no lawful reason for detention or arrest.  *See Kacz v. State*, 287 S.W.3d 497 (Tex. App. – [14th – Houston – 2009) ("…Kacz cannot reasonably claim that Cornelio evaded a lawful arrest or detention, as there is no underlying offense to justify an arrest or detention. See Tex. Penal Code Ann. §38.04(a)").

Here, there is video and audio recording of the events. The Fifth Circuit has made clear that the appellate court is not required to accept factual allegations that are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Rather, we should "view the facts in the light depicted by the videotape." *Id.* at 381, 127 S.Ct. 1769. In this case, policies and/or the lack thereof, as well as video evidence, reveals policies and practices which would require the court to blatantly disregard the contradicted evidence which led to Luis Argueta's death, in order to grant summary judgment.

Viewing the facts from the officer's eyes is problematic for Jaradi: Argueta drove in the alleyway, traveling from 50th to 53rd Street. One officer said lights were on, another says they were not on. The videotape/dashcam video contradicts the assertion regarding the lights being off and that a high-speed chase took place. The officer contended Argueta did not stop at two stop signs. The videotape/MVR is telling - again – showing Argueta stopping at the stop signs. Mary Luna affirms as much also. These are the fundamental contradictions which cannot be ignored.

Argueta came to a stop near the girlfriend's home. He told Mary Ann Luna he was not going to stay put. He was nervous from the time she told him they were glaring at him. He stopped the vehicle and can be seen flashing across the screen in a southerly direction – not towards the officers. Arguetta attempted to flee into a vacant lot with the weapon secreted. The MRV being activated late adds additional doubt to Jaradi's supposed reasonableness.

When they do activate the camera, we see Argueta moved away from the officers, not towards them, secreting an unseen weapon, without a round in the chambers. Admittedly, the officers would not know the weapon did not have a round in the chambers, but it is undisputed when viewing the video that the weapon is not visible (again, a fundamental contradiction); that Argueta moved into the vacate lot; that Jaradi stopped, raising his service weapon and took aim, at which time Jaradi admitted he had not seen a gun, and was not in fear for his life.

Jaradi fired two shots into Argueta's back. Jaradi testified the lighting was poor on one hand but concomitantly alleges he could see, commanding Argueta to remove his right hand from his pocket; once Argueta complied Jaradi fired two rounds into Argueta's back. The video evidence reflected none of the words Jaradi contended he said, the contradictions are telling.

Jaradi is seen and heard giving warnings after he fired - pretending to be a reasonable officer – so others with the Department can see and hear - "drop it, drop it" - when the evidence reflects Argueta  is on the ground - on his back - in obvious pain, saying, "it's dropped, it's dropped."  Argueta's hands are up. He repeats himself multiple times.

Absolutely, the reasonableness of a particular use of force must be judged from the respective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. It is not 20/20 hindsight when Jaradi's fellow officers and supervisors come to scene and begin to engage in slow-rolling giving medical aid to Argueta, as Argueta lay on the ground bleeding to death and pleading for help. Sergeant Caldwell instructed everyone to slow down over the radio, and it was as if the scene was a movie set - the sirens in the distance grew silent, and multiple officers stand around looking, doing nothing, waiting for Argueta to bleed out. The EMS personnel arrive in a casual stroll from stage right, exchanging pleasantries with the officers – it is not as if a young man's life is as stake.

B.  Violation of Decedent's Constitutional Rights.

Jaradi and others seem to ipso facto want to be able to view the facts from hindsight and contend since Argueta had a gun on his person, his death was justified.  Even if we change our laws to make carrying a weapon commonplace, we have not changed our Constitution. "As in other Fourth Amendment contexts, however, the `reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

In excessive force cases, "[t]he second prong of the [qualified immunity] analysis 'is [itself] better understood as [encompassing] two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Tarver v. City of Edna,* 410 F. 3d 745, 750 (5th Cir. 2005) (quoting *Felton v. Polles,* 315 F. 3d 470, 477 (5th Cir. 2002)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any

reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 572 U.S. 765, 778-79, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver,* 410 F.3d at 750.

Plaintiffs have properly pled a violation of a right secured by the Constitution or laws of the United States, and have demonstrated the alleged deprivation was committed by a person acting under color of state law. *Tennessee v. Garner* remains well-established law.  An officer must, at the very least, have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. In *Graham v. Connor*, 490 U.S. 386, 388 (1989), the Supreme Court directed courts determining an officer's objective reasonableness to pay, "careful attention to the facts and circumstances of each particular case, including (1) the severity of the crimes at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Viewing the facts in a light most favorable to the officers, they conjecture probable cause because of the time of the night, when the existing evidence supports decedent visited inside the store and did not linger in the parking lot, with one officer saying that he sped off, the other saying he did not, and with Mary Ann

Luna denying the specious allegation. A slow speed evading or a scared minority child seeking to get himself and his girlfriend home safely, either one is reflected in the facts, neither of which warrants the death penalty.

Absolutely, officers make split second decisions, as Jaradi did when he stood and fired at the decedent as he ran away – as Jaradi had clearly intended to do from the moment, two seconds after exiting his patrol car, when he raised his service weapon and took careful and deliberate aim; the autopsy report shows that the shots both entered Argueta's body exactly twelve centimeters below the coroner's line of measurement.

Argueta was not a licensed driver – this conduct does not justify deadly force. Argueta was in possession of a weapon without a chambered round – this too seems protected at the minimum but viewed in the worst case scenario, did not justify deadly force.  At the summary judgment stage, however, all inferences are still drawn in the plaintiffs' favor. *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). This is true "even when ... a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton,* 572 U.S. 650, 657, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). Likewise, "under either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656, 134 S.Ct. 1861. "Accordingly, courts must take care not to define a case's `context' in a manner that imports genuinely disputed

factual propositions." *Id.* at 657, 134 S.Ct. 1861; *see, e.g., Tarver,* 410 F.3d at

754 (dismissal at summary judgment phase inappropriate because determining

whether officer's conduct was objectively unreasonable in light of clearly

established law required factfinding and credibility assessments).

Summary judgment on behalf of Officer Jaradi in his individual capacity

should be denied.

III.    City of Galveston's Custom, Policy and Practice.

The custom, practice or policy assertion, in which Plaintiffs complain the

City's failure to train, and deficient policies, which caused the secreting of

evidence from an investigation (preventing the finding of violations and

underreporting. In the case of *Backe v. City of Galveston*, 2 F. Supp. 3d 988, (S.D.

Texas – Houston Division), the district court expounds of the history of the

Galveston Police Department and its underreporting, citing former Chief Charles

Wiley, "Chief Wiley acknowledges that deficient reporting can be motivated by a

desire to avoid accountability for using force. He also acknowledges that poor

reporting makes it difficult to investigate the propriety of the use of force." *Id.* at

997.

Judge Ellison found the City of Galveston should remain the lawsuit for its

failure to train its officers on the use of force. Judge Ellison granted summary

judgment with regard to plaintiffs' claim they were injured by the City's

underreporting the use of violence.

Municipalities are considered "persons" subject to suit under Section 1983

for civil rights violations. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S.

658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). However, "a municipality

cannot be held vicariously liable for the constitutional torts of its employees or

agents." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir.1999).

This is because Section 1983 requires a showing that the defendant "subject[ed] or

cause[d a plaintiff] to be subjected" to a deprivation of a federal right, *see* 42

U.S.C. § 1983, a requirement that "cannot be easily read to impose liability

vicariously on governing bodies solely on the basis of the existence of an

employer-employee relationship with a tortfeasor." *Monell*, 436 U.S. at 692, 98 S.

Ct. 2018. The Fifth Circuit has summarized the elements required for a *Monell*

claim as "a policymaker; an official policy [or custom]; and a violation of

constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v.

City of Houston*, 237 F.3d 567, 578 (5th Cir.2001) (citation omitted). These

elements "exist to prevent a collapse of the municipal liability inquiry into a

respondeat superior analysis." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161,

167 (5th Cir. 2010).

In *Backe*, the history of underreporting related to the violence in the department. Lt. Joel Caldwell was the ranking officer and on-scene commander at the H2o incident complained about in *Backe*, *supra* at 927.  Chief Wiley briefly visited the scene the night in question. He told Lt. Caldwell to make sure the reports were thorough, and he departed. *Id.*  "The next day – October 5, 2008, Chief Wiley pulled the initial police reports from the incident. He instantly knew from the lack of heft alone; the reports were deficient." *Id.*

Joel Caldwell is the same period seen on video signaling to kill the camera, saying to kill the camera (cut your camera off), secreting the camera to hide the violation of a citizen's constitutional rights. The City of Galveston policies and practice in permitting this behavior has been a force in the death of Luis Argueta.

Caldwell testified in his deposition that he moved from the position of lieutenant to sergeant because he disagreed with the philosophy and direction of the chief (attachment 20, deposition excerpts of Joel Caldwell at 14-15. The *Backe* case reflect Caldwell was part of the problem and was assigned the investigation in that case, even though he was involved that night. It is frightening to see a supervisor taking advantage of a poorly written and deficient policy – regarding body cameras - to keep the truth hidden in this case. The City's practices, policies and procedures were the driving force behind the constitutional violations in this case.

Both Jaradi and Larson testified with regard to not knowing or not being trained on the use of bodycams and Police Department's Policy Manual. Both Jaradi and Larson can be seen on camera being subjected to these policies and practices - cut your camera off, be quiet. The admitted lack of training is consistent with willful ignorance, supported by a Policy Manual which falls under the department's chief policymaker, the Chief of Police. If the alleged custom or policy on its face "violate[s] federal law or authorize[s] the deprivation of federal rights," the culpability requirement is clearly met. Alternatively, a municipality can be culpable for a facially constitutional custom or policy if it was "adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences," *O'Neal v. City of San Antonio*, 344 Fed.Appx. 885, 888 (5th Cir.2009), specifically the "risk that a violation of a particular constitutional or statutory right will follow." *Board of Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Deliberate indifference of this sort is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability." Piotrowski, 237 F.3d at 579 (*quoting Bryan Cnty.*, 520 U.S. at 407, 117 S.Ct. 1382).

The motion to dismiss the City of Galveston out of cased should be denied in all parts.

IV.     Survival and Wrongful Death Actions

Wrongful death statutes establish actions which may be brought by persons identified by statutes who are entitled to compensation under § 1983 for their own injuries sustained as a result of the deprivation of the deceased person's constitutional rights.  *Baker v. Putnal*, 75 F. 3d 190, 195 (5th Cir. 1986); *Kahng v. City of Houston*, 485 F. Supp. 2d 787, 792 (S.D. Tex. 2007) (summarizing cases).  The Texas wrongful death statute provides that only the decedent's spouse, children, and parents may bring an action for wrongful death.  *See* Tex. Civ. Prac. & Rem. Code Ann.§ 71.004; *Shepherd v. Ledford*, 962 S.W. 2d 28, 31 (Tex. 1998).  Further wrongful death benefits in Texas do not belong to a decedent's estate.  *Brown v. Edwards Transfer Co., Inc*., 764 S.W. 2d 220, 223 (Tex. 1988).

Jelldy Argueta and Tomas Argueta are siblings of the decedent, Luis Argueta.  As such, Plaintiffs agree that neither is within the class of individuals with standing to bring an action for the decedent's wrongful death.  *See Aguillard*, 207 F. 3d at 231 (recognizing that under Texas law, siblings of decedent do not have standing to bring wrongful death action).[87]

---

[87] Because Tomas is no longer a party to the instant suit (*see* this Court's Order of Dismissal, entered December 17, 2021 (doc. 42), the following analysis addresses the facts insofar as they involve Jelldy Argueta.

A survival action, on the other hand, involves damages personal to the decedent. *See* Tex. Civ. Prac. & Rem. Code § 71.021 ("A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person ... ). It differs from a wrongful death action in that it "preserves a claim for the estate rather than creating a new cause of action for those surviving the decedent." *Pluet*, 355 F.3d at 384; *see also Austin Nursing Center, Inc. v. Lovato*, 171 S.W. 3d 845, 849-50 (Tex. 2005). Section 71.021 provides that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person."

Generally, "only the estate's personal representative has the capacity to bring a survival claim." *Austin Nursing Center*, 171 S.W. 3d at 850 (citing *Frazier v. Wynn*, 472 S.W. 2d 750, 752 (Tex. 1971)). Heirs may be entitled to sue on behalf of the estate only under certain circumstances. *Id.*

In *Shepherd*, the Texas Supreme Court "held that '[h]eirs at law can maintain a survival suit during the four-year period the law allows for instituting administration proceedings if they allege and prove that there is no administration pending and none [is] necessary.'" *Austin Nursing Center*, 171 S.W. 3d at 850-51 (citing *Shepherd*, 962 S.W. 2d at 31- 32). A family agreement regarding the disposition of the estate's assets may be sufficient to establish that no administration is necessary. *Id.*

As a sibling, Plaintiff Jelldy Argueta is an heir of her deceased brother's estate for purposes of the Texas Survival Statute. Texas Probate Code § 22.015 defines "heir" as " a person who is entitled under the statutes of descent and distribution to a part of the estate of a decedent who dies intestate." Plaintiff, however, must show that administration of the estate is not pending, or that none is necessary, as set out in *Shepherd* and *Austin Nursing*.

Jelldy Argueta is entitled, under the law, to bring a survival action. She has alleged facts in the attached Declaration which are sufficient to support her standing (*also see* attached Declaration of Counsel). Plaintiffs will agree to substitute decedent's mother, Blanca Granado, in this case on behalf of Luis Argueta's estate, if the Court deems such necessary.

V. Conclusion and Prayer

Accordingly, Plaintiffs respectfully submit Defendants' Motion for Summary Judgment should be denied in all parts.

DATE:  February 21, 2022.

Respectfully submitted,

/s/ Ellyn J. Clevenger
_____

Ellyn J. Clevenger
Attorney-In-Charge
Federal I.D. No. 3597745
State Bar No. 24058662
1115 Moody Avenue
Galveston, Texas 77550
409.621.6440

Gene A. Watkins
Federal I.D. No. 112993
State Bar No. 24058954
Sherman Watkins PLLC
gwatkins@shermanwatkins.com
1418 Washington Avenue
Houston, Texas 77002
713.224.5113

ATTORNEYS FOR PLAINTIFFS
SANTOS ARGUETA, BLANCA
GRANADO, DORA ARGUETA, AND
JELLDY ARGUETA,
INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF
LUIS FERNANDO ARGUETA

<u>APPENDIX TO MOTION FOR SUMMARY JUDGMENT</u>

Attachment 1        Policy Manual, City of Galveston Police Department, excerpted

Sections 106, 204, 210, 214, 216, 304, 1004

Attachment 2        Deposition excerpts/Defendant Derrick Jaradi

Attachment 3        Deposition excerpts/Mary Ann Luna

Attachment 4        Deposition excerpts/Officer Matthew Larson

Attachment 5        Picture of Sunny's Food Mart [from Broadway]

Attachment 6        Picture of vacant lot

Attachment 7        Picture of vacant lot

Attachment 8        Picture of vacant lot

Attachment 9        Picture of vacant lot

Attachment 10       [intentionally left blank]

Attachment 11       [intentionally left blank]

Attachment 12       [intentionally left blank]

Attachment 13       [intentionally left blank]

Attachment 14       Affidavit of Mary Ann Luna

Attachment 15       City map/subject area

Attachment 16       Report of Glock

Attachment 17       Certified copy of Autopsy

Attachment 18       Supplement Report Officer C. Thompson

Attachment 19      Excerpt from Joel Caldwell's Supplemental Report

Attachment 20      Deposition excerpts for Sgt. Joel Caldwell

Attachment 21      Deposition excerpts for Lt. Carmen Renaye Ochoa

Attachment 22      Policy 423, Portable Audio/Video Recorders [new policy]

Attachment 23      Picture of Caldwell's hands (bracelet) with Jaradi lying prone

on his stomach

Attachment 24      Picture of Caldwell's hand (bracelet) reaching in to turn off

Jaradi's bodycam

Attachment 25      Dashcam video/Jaradi/Larson's unit/footage

Attachment 26      Officer Jaradi's bodycam footage

Attachment 27      Officer Larson's bodycam footage

Attachment 28      Officer Christian McCormack's bodycam footage

Attachment 29      Officer Charles Thompson's bodycam footage

Attachment 30      Officer James Ewing's bodycam footage

Attachment 31      Sgt. Caldwell's bodycam footage

Attachment 32      Officer Justin Owen's bodycam footage

Attachment 33      Officer Jacob Pitts' bodycam video

Attachment 34      Sergeant Xavier Hancock's bodycam footage

Attachment 35      Officer Kamerom Mooneyham's bodycam footage

Attachment 36      Galveston County Sheriff Investigator's [Michael] bodycam

Attachment 37        Jaradi's bodycam footage, Part II

Attachment 38        Defendant's Answers to Plaintiff's Second Set of

Interrogatories, Question 21, Question and Answer, page 2-3

Attachment 39        Picture from Sunny's Food Mart, depicting Luis Argueta

exiting the store

DECLARATION OF COUNSEL, PURSUANT TO 28 U.S.C. § 1746

I am counsel for the Plaintiffs in the above-captioned suit.  All statements of fact made in the Plaintiffs' response to Defendants' motion for summary judgment, filed on today's date, are true and correct, to the best of my knowledge, information, and belief; and all documents attached thereto are true and correct copies of documents obtained from the Defendants in the discovery process, or in response to Public Records Requests made prior to filing the instant suit.  I further attest that I have searched the property and probate records, and no administration of the estate of decedent, Luis Argueta, is pending, and none is necessary. I also can, and do, attest to the truth of the statement made by Jelldy Argueta via unsworn declaration, filed with this Court on today's date, as to the agreement amongst Luis Argueta's family members regarding disposition of Luis Argueta's estate.

I declare under penalty of perjury, and under the laws of the United States of America, that the foregoing is true and correct.

Executed this 21st Day of February, 2022.

_Ellyn J. Clevenger_

ELLYN J. CLEVENGER

Certificate of Service

This is to certify that on this the 21st day of February, 2022, the foregoing

document was forwarded to opposing counsel by electronic transmission, at the

time of filing.


*/s/ Ellyn J. Clevenger*
_____
Ellyn J. Clevenger
Counsel for Plaintiffs